**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ECO TEC INSULATION, INC., an Illinois corporation, | ) ) | |
| Plaintiff, | ) | |
| | ) | No. 1:10-cv-02478 |
| v. | ) | |
| | ) | Hon. Judge William J. Hibbler |
| TOM DECKER; and, SMART SEALED INSULATION, LLC | ) ) | |
| | ) | Hon. Magistrate Susan E. Cox |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF**

Plaintiff Eco Tec Insulation, Inc. ("Eco Tec") launched its spray foam insulation business in 2008 and hired defendant Tom Decker ("Decker") to begin selling its products soon thereafter. As a condition of Decker's employment, he agreed to enter into an employment agreement (the "Agreement") containing various covenants, including obligations regarding confidentiality, non-disclosure and non-competition. Before his employment with Eco Tec, Decker had no experience in the business of installing spray foam insulation or in the construction industry generally. Eco Tec invested heavily in training Decker, entrusted him with significant responsibilities and provided him access to a host of trade secrets and proprietary information. However, as Decker's role within Eco Tec expanded, he became disgruntled and began demanding an equity stake in the company.

In 2010, defendant Smart Sealed Insulation, Inc. ("Smart Sealed"), a newly formed competitor of Eco Tec, offered Decker a position. Decker relayed the offer to Eco Tec and made a demand for an equity stake in the company which Eco Tec declined to meet. Thereafter, Decker decided to end his relationship with Eco Tec and threatened to retain Eco Tec's proprietary information unless Eco Tec agreed to waive the restrictive covenants in Decker's

employment agreement. Eco Tec refused to accept that strong-arm proposal. It later discovered that before issuing the ultimatum, late in the evening on March 30, 2010, Decker downloaded software designed to extract and eliminate information stored on the Eco Tec computer in his possession. On information and belief, Decker is about to begin working for Smart Sealed. Eco Tec asks this Court to enter a temporary restraining order and, thereafter, a preliminary injunction, to enjoin Decker from working for Smart Sealed and to prohibit Decker and Smart Sealed from using Eco Tec's valuable proprietary, confidential and trade secret information and thereby cause irreparable harm to Eco Tec.

## BACKGROUND

Eco Tec is an Illinois corporation with multiple offices located in Skokie, Northbrook and Chicago, Illinois. (*See* the Verified Compl., ¶ 4, Dkt. 1.) Eco Tec was, and currently is, in the business of selling and installing customized spray foam insulation for both residential and commercial structures in the greater Chicagoland area, including southern Wisconsin and northern Indiana. (*Id.*) As part of its business, Eco Tec consults with customers and potential customers and develops confidential customer profiles. (*Id.*) Since its inception, Eco Tec has used spray foam insulation manufactured by a Canadian-based company, Icynene, Inc. ("Icynene") (*Id.*) Eco Tec is an authorized seller and installer of Icynene products and is one of the top 25 sellers of Icynene insulation in the United States, qualifying Eco Tec as an Icynene "Gold Circle" installation company. (*Id.*)

### *Eco Tec Hires Decker as a Salesperson*

Decker began his employment with Eco Tec as a salesperson on March 28, 2008. (*Id.*, ¶ 5.) As a condition of his employment with Eco Tec, Decker agreed to and signed an Employment Agreement (the "Agreement") in March of 2008 containing various restrictive covenants. (*Id.*, ¶

13, attached as Exhibit "A").[1] Before his employment with Eco Tec, Decker had no experience

in the business of installing spray foam insulation, or any type of insulation whatsoever. (*Id.*)

He came to Eco Tec with no knowledge of the industry, no contacts and no customers. (*Id.*)

Any and all training Decker received in the industry came from Eco Tec which, *inter alia*, paid

for his travel and other expenses to become a certified sales consultant. (*Id.*)

### Decker Is Provided Access to Confidential Information

Eco Tec provides certain employees in trusted positions on a "need-to-know" basis with

limited access to its customer and contact files, bidding process documentation and marketing

documents. (*Id.*, ¶ 14.)  By virtue of his positions and tenure with Eco Tec, Decker was privy to

this and other confidential information, including the following: data on actual and prospective

accounts; architectural firms that might result in referral business; sales, pricing, and marketing

plans; customer profiles; and information regarding Eco Tec's purchasing history and

relationship with Icynene. (*Id.*, ¶ 15.)  Because Decker was involved in sales, Decker also had

access to and became familiar with Eco Tec's computer system, which contained confidential,

proprietary and trade secret information.  (*Id.*, ¶ 16.)

To allow Decker to carry out his employment duties effectively, Eco Tec assigned

Decker to represent Eco Tec in marketing efforts with networking groups, governmental entities,

architects and other potential sources of client referrals. (*Id.*, ¶ 18.) The customer and marketing

materials that Eco Tec provided to Decker contained confidential and proprietary information,

including, but not limited to, some or all of the following: (i) customer accounts, budgets, and

proposals including the "takeoff" final bid data; (ii) potential customer lists; (iii) information

regarding Eco Tec's commercial projects; (iv) trade show lists, including budget and marketing

strategies; (v) marketing strategies and overall objectives; (vi) project cost data for each project

---

[1] The Agreement is also attached as Exhibit A to the Verified Complaint.

revealing profit margins; (vii) specialized research on customers; (viii) marketing expenses for various vendors; (ix) information regarding the status of all marketing projects; (x) Eco Tec's communications with governmental entities and environmental policy organizations regarding subsidies for marketing and the rebates offered for the installation of energy efficient insulation; and (xi) Eco Tec's bid placement through the construction industry "Blue Book". (*Id.*)

### *Eco Tec Secures its Valuable Confidential Information*

The development and retention of its confidential customer profiles and confidential pricing and bidding techniques gives Eco Tec certain valuable competitive advantages, both in its general capacity as a provider of spray foam insulation and specifically as a distributor of Icynene products. (*Id.*, ¶ 12.) As such, the confidential information is sufficiently secret to derive economic value from not being generally known to Eco Tec's competitors, who could otherwise obtain economic value from the disclosure of said confidential information. (*Id.*) Eco Tec took reasonable steps to maintain the confidentiality of this information, including: (1) making such information available within Eco Tec only on a need-to-know basis; (2) paying valuable consideration to top level employees for their agreement to keep such information confidential, both during and after the termination of their employment with Eco Tec; and (3) restricting information available to competitors, customers and the general public by storing it on a secure computer network with restricted access rights. (*Id.*) As a result, this confidential information would not be known to Eco Tec's competitors unless improperly disclosed. (*Id.*)

### *Smart Sealed Solicits Decker While Decker is an Eco Tec Employee*

Smart Sealed is a newly formed Illinois company that is in the early stages of directly competing with Eco Tec for a share of the spray foam insulation market in the greater Chicagoland area. (*Id.*, ¶ 6.) One of the members of Smart Sealed, Frederic Gale ("Gale"), met

4

with Decker while he was employed by Eco Tec, to discuss the possibility of Decker joining Smart Sealed. (*Id.*, ¶ 20.) Gale and other members of Smart Sealed, including David Kirk, also communicated with Decker while he was still employed by Eco Tec to establish an Icynene installation company with Decker's involvement, and to the exclusion of Eco Tec. (*Id.*, ¶ 21.) Decker attempted to hide his communications with Gale by referring to him as "Henry Tail" in his Outlook contact list and in other communications stored on Eco Tec's internal electronic mail system. (*Id.*, ¶ 22.) This ruse was not effective since the electronic mail address stored under "Henry Tail" was as follows: gale.frederick@yahoo.com. (*Id.*).

### *Decker Attempts to Leverage Eco Tec with the Smart Sealed Offer*

Prior to Decker's resignation, Eco Tec became aware that Smart Sealed was negotiating with Decker regarding the possibility of Decker leaving Eco Tec. (*Id.*, ¶ 25) On multiple occasions in March 2010, Decker made reference to an offer from Smart Sealed during communications with one of the co-founders of Eco Tec, Brian Holtzman ("Holtzman"). (*Id.*) On March 12, 2010, Decker forwarded to Holtzman a formal offer Smart Sealed extended to Decker and subsequently insisted that Eco Tec provide Decker with an equity stake in Eco Tec. (*Id.*) After Eco Tec refused to accede to Decker's demands, Decker informed Holtzman on March 31, 2010 that he was planning to leave Eco Tec and that he had taken Eco Tec's proprietary information from a laptop computer issued to him by Eco Tec. (*Id.*, ¶ 26.) However, Decker proposed that if Eco Tec would agree to give him "immunity" for his breach of the non-competition clause in the Agreement, Decker would return all of the information. (*Id.*) Eco Tec refused to waive the restrictive covenants in the Agreement and advised Decker that he should abide all of the terms of the Agreement. (*Id.*)

### *Decker Maliciously Attempts to Prevent Eco Tec from Accessing Its Proprietary Information and Keeps the Information for Himself*

Eco Tec issued a laptop computer and iPhone to Decker that was connected to Eco Tec's secure electronic network and Eco Tec's secure server network. (*Id.*, ¶ 30.) Eco Tec owned the computer and iPhone and the subject proprietary, confidential and trade secret information stored on the devices, which was entrusted to Decker in his capacity as an employee of Eco Tec. (*Id.*) After Eco Tec suspected that Decker was plotting to misappropriate its information, it conducted a search of Decker's work computer. (*Id.*, ¶ 31.) Eco Tec discovered that Decker downloaded an application named "Eraser 6.0.6.1376" on to his Eco Tec laptop computer on March 30, 2010 at 9:57 PM. (*Id.*) The primary function of the Eraser application is the removal and/or secreting of information stored on computer hard drives.[2] (*Id.*) Eco Tec further discovered that a great deal of confidential and proprietary trade secret information was no longer on the laptop after Decker downloaded the "Eraser" program on March 30, 2010. (*Id.*, ¶ 32.) These files included, but are not necessarily limited to, the following confidential and proprietary trade secrets: (1) current customer project estimate information including "takeoff" final bid data on all of the customer accounts in Decker's pipeline; and (2) a Microsoft Outlook file assigned to Decker including contact information for architects, contractors, vendors, officials working for governmental entities, customers and other marketing contacts that includes field for notations.[3]

***Decker Leaves Eco Tec without Notice and is About to Begin Working at Smart Sealed***

The Agreement provides that Decker's employment with Eco Tec "shall not terminate on less than fourteen (14) days prior written notice to [Eco Tec]." (*Id.*, ¶ 27.) Nevertheless, on March 30, 2010, Decker informed Eco Tec that he planned to return the laptop computer issued to him at 1:00 p.m. on March 31, 2010. (*Id.*) Holtzman arrived at the Eco Tec offices in Skokie,

---

[2] "Eraser is a secure data removal tool for Windows. It completely removes sensitive data from your hard drive by overwriting it several times with carefully selected patterns." *See http://eraser.updatestar.com/* (last visited April 19, 2010).
[3] Eco Tec identifies numerous other types of proprietary and confidential files in the Verified Complaint.

Illinois at roughly 7:00 a.m. on March 31, 2010 and discovered that during non-business hours, Decker left at the premises the Eco Tec laptop computer, along with Decker's company credit cards. (*Id.*, ¶ 28.) Thereafter, Decker refused to meet with Eco Tec to discuss the terms of his termination, his current employment or his retention of proprietary information belonging to Eco Tec. (*Id.*) On information and belief, Decker intends to begin working with Smart Sealed imminently by soliciting customers for spray foam insulation. (*Id.*, ¶ 29.)

Without immediate injunctive relief, Eco Tec will be irreparably harmed. (*Id.*, ¶ 2.) Specifically, Eco Tec will be unable to repair the damage done to its business relations with its existing customers and will lose the competitive advantage it has quickly established in its two years of successful operations. (*See id.*, ¶ 57.)

## LEGAL STANDARD

A temporary restraining order is an emergency remedy issued to maintain the status quo until a hearing can be held on an application for a preliminary injunction. Consumer Sales v. Digital Equip. Corp., 1995 U.S. Dist. LEXIS 13374, *5 (N.D. Ill. Sept. 15, 1995). The elements that a party moving for a temporary retraining order are analogous to those applied in considering motion for a preliminary injunction. YourNetDating, LLC v. Mitchell, 88 F. Supp. 2d 870, 871 (N.D. Ill. 2000). Under Illinois law, a preliminary injunction will be granted if the plaintiff can show that: (1) he possesses a clear right or interest that needs protection; (2) an inadequate remedy at law exists; (3) irreparable harm will result if it is not granted; and (4) there is a reasonable likelihood of success on the merits. Outsource Int'l, Inc. v. Barton & Barton Staffing Solutions, 192 F.3d 662, 666 (7th Cir. Ill. 1999) (*citation omitted*).

**ARGUMENT**

**I.     THE COURT SHOULD ISSUE AN INJUNCTION TO PREVENT DECKER AND SMART SEALED FROM USING AND DISCLOSING ECO TEC'S VALUABLE INFORMATION AND TO PREVENT DECKER FROM COMMENCING HIS SALES ON BEHALF OF SMART SEALED**

Eco Tec seeks a temporary restraining order to prevent Decker from further violating the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1330, *et seq*., the Illinois Trade Secret Act ("ITSA"), 765 ILCS 1065/1, *et seq*., and breaching the Agreement.  Eco Tec also moves to enjoin Smart Sealed from violating the ITSA by using Eco Tec's confidential and proprietary trade secrets.

**A.     Eco Tec Has a Strong Likelihood of Success on the Merits**

In order to demonstrate a likelihood of success on the merits, a plaintiff must show that its "chances are better than negligible.**"**  National People's Action v. Wilmette, 914 F.2d 1008, 1010-1011 (7th Cir. Ill. 1990); citing Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386-87 (7th Cir. 1984).  If the movant can meet this threshold burden, the Court then applies a "sliding scale" analysis of the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits.  Id.  In the present case, Eco Tec has a strong likelihood of success on its claim for relief against Decker given that the record clearly indicates that Decker maliciously sought to harm Eco Tec in contravention of his Agreement.

**1.     Violation of the Computer Fraud and Abuse Act**

To state a civil claim for violation of the CFAA, a plaintiff must allege: 1) damage *or* loss; 2) caused by; 3) a violation of one of the substantive provisions set forth in § 1030(a); and 4) conduct involving one of the factors in § 1030(c)(4)(A)(i)(I)-(V). See § 1030(g); Kluber Skahan & Assocs., Inc. v. Cordogan, Clark & Assoc., Inc., 2009 U.S. Dist. LEXIS 14527, *20

8

(N.D. Ill. Feb. 25, 2009); quoting Motorola, Inc. v. Lemko Corp., 609 F. Supp. 2d 760, 766

(N.D. Ill. 2009). A person violates section 1030(a)(2) if he "intentionally accesses a computer

without authorization or exceeds authorized access and thereby obtains . . . information from any

protected computer if the conduct involved an interstate or foreign communication." 18 U.S.C. §

1030(a)(2). Eco Tec contends that Decker's unauthorized access of its data resulted in both

damage to data stored on its computers *and* losses incurred in attempting to recover the data

greater than the $5,000 CFAA thresholds. (*See* Holtzman Decl., ¶¶ 2-4, attached as Exhibit "B")

Under the CFAA, "the term 'damage' means any impairment to the integrity or

availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Eco Tec

alleges that Decker not only absconded with its valuable data but also that he then used it as a

bargaining chip to compel Eco Tec to waive its rights under the Agreement. (*See* Ver. Compl., ¶

26, Dkt. 1) Eco Tec later came to realize that Decker's threat was not idle when it discovered

that Decker had downloaded an "Eraser" software program to withdraw its data (*Id.*., ¶ 32)

Separate and distinct from the damages brought about by Decker's destruction of data are

the losses absorbed by Eco Tec in trying to rectify the damages. The term "loss" refers to "any

reasonable cost to any victim, including the cost of responding to an offense, conducting a

damage assessment, and restoring the data, program, system, or information to its condition prior

to the offense, and any revenue lost, cost incurred, or other consequential damages incurred

because of interruption of service." 18 U.S.C. § 1030(e)(11). Eco Tec has thus far expended no

less than $5,000.00 in its attempts to regain the data Decker took from it and anticipates those

costs to mushroom as the extent of the data loss becomes clearer. (*See* Ex. B, ¶ 3).

Decker's actions in secreting Eco Tec's confidential and proprietary trade secret

information by downloading an "Eraser" program onto the computer provided to him by Eco Tec

9

clearly "exceeded authorized access" as that term is defined in 18 U.S.C. § 1030(e)(6). Decker's

authorization to access Eco Tec's data ended as soon as he set out to leave Eco Tec and use its

property to his own advantage, thereby violating his duty of loyalty. Int'l Airport Ctrs., L.L.C. v.

Citrin, 440 F.3d 418, 420 (7th Cir. 2006) (*Citations omitted*). "Unless otherwise agreed,

the authority of the agent terminates if, without knowledge of the principal, he acquires adverse

interests or if he is otherwise guilty of a serious breach of loyalty to the principal." Id. at 421.

Thus, Decker violated the CFAA by misappropriating data once Eco Tec rejected his proposal

that it waive its right to enforce the Agreement.

Courts have upheld the use of the CFAA in granting injunctive relief against former

employees and their new employers who have attempted to obtain a competitive edge by

removing information from a former employer's computers. See, *e.g.*, Mintel Int'l Group, Ltd. v.

Neergheen, 2008 U.S. Dist. LEXIS 54119, *6 (N.D. Ill. July 16, 2008); citing YourNetDating,

LLC v. Mitchell, 88 F. Supp. 2d 870, 872 (N.D. Ill. 2000) (granting TRO under CFAA claim

against former employee).

### 2. Violation of the Illinois Trade Secret Act

To state a claim under the ITSA, a plaintiff must further allege that a trade secret was

misappropriated, and that it was used by the defendant in its business. Learning Curve Toys, Inc.

v. PlayWood Toys, Inc.*,* 342 F.3d 714, 721 (7th Cir. 2003). The ITSA defines a "trade secret" as

information that:

> (i) is sufficiently secret to derive economic value, actual or potential, from
> not being generally known to other persons who can obtain economic
> value from its disclosure or use; and

> (ii) is the subject of efforts that are reasonable under the circumstances to
> maintain its secrecy or confidentiality.

765 ILCS 1065/2(d).  Both of these definitions focus on the secrecy of the information sought to

be protected. *See* Mangren Research & Dev. Corp. v. Nat'l Chem. Co., Inc., 87 F.3d 937, 942

(7th Cir. 1996).  The various files Decker removed in the days preceding his departure contained

information not disseminated into the public domain.  (Verified Compl., ¶¶ 12, 14)

The ITSA defines "misappropriation" in multiple ways.  One way violators can

misappropriate trade secrets is by acquiring them through improper means such as the breach of

a confidential relationship. 765 ILCS 1065/2(b)(1).  Misappropriation also occurs when a

defendant breaches a duty owed to protect the secrecy of certain information or induces another

party to do so. 765 ILCS 1065(b)(2)(B). The statutory definitions of "misappropriation" mirror

Decker's conduct.  Section 3 of the ITSA provides that "actual or threatened misappropriation

may be enjoined."  765 ILCS 1065/3; *see also* RKI, Inc. v. Grimes, 177 F. Supp. 2d 859, 880

(N.D. Ill. 2001) (granting permanent injunction against an employee and his new employer

because of the employee's misappropriation of, *inter alia*, customer lists); PepsiCo v. Redmond,

54 F.3d 1262 (7th Cir. 1995) (affirming injunction to prevent inevitable disclosure of trade

secrets); Stampede Tool Warehouse v. May, 272 Ill. App. 3d 580, 651 N.E.2d 209 (1st Dist.

1995) (award of injunctive relief upheld where defendants misappropriated a customer list which

qualified as a trade secret under the Act).  Because Eco Tec has direct evidence of Decker's

scheme to abscond with its trade secrets and, at a minimum, Smart Sealed's constructive

knowledge of the scheme, it has shown a likelihood of success in proving ITSA violations.[4]

**3.      Decker is violating restrictive covenants within the Agreement.**

The Agreement between Decker and Eco Tec states as follows:

---

[4] Plaintiffs are not required to plead highly specific facts on improper trade secret use, because such facts often will not be available before discovery.  Motorola, 609 F. Supp. 2d at 771.  In addition, plaintiffs frequently prove trade secret misappropriation through the introduction of circumstantial evidence. *See* Ferroline Corp. v. General Aniline & Film Corp., 207 F.2d 912 (7th Cir. 1953) (emphasizing that use or disclosure is difficult to establish since it is usually proven through circumstantial evidence).

11

> For the period beginning on the date of this Agreement and ending on the date two (2) years after the Termination Date (the "Non-Competition Period"), [Decker] shall not, without the prior written consent of [Eco Tec], which [Eco Tec] may grant or withhold in its sole discretion: engage in any **Competitive Activities**; or interfere in, profit from, either directly or indirectly, solicit or induce any change in or cessation of, the independent contractors, referral sources, business relationship between [Eco Tec] and any of its customers, employees, agents representatives or suppliers.[5]

(Verified Compl., ¶ 48, *see* Ex. A at § 11.3.2) (*emphasis supplied*). "Competitive Activities" are

defined in the Agreement as:

> (i) directly or indirectly be employed or retained by a person or entity, which provides insulation products and/or services or compete with [Eco Tec] in the states of Illinois, Wisconsin or Indiana; (ii) directly or indirectly own any interest in any person, business or entity, which…competes with [Eco Tec] in the states of Illinois, Wisconsin or Indiana; and/or (iii) perform similar services or duties as [Decker] performed for [Eco Tec] during the Term of Employment for any person, business or entity, which…competes with Employer in the states of Illinois, Wisconsin or Indiana.

(*Id.*, ¶ 49, *see* Ex. A at § 1)). The Agreement also provides, in relevant part, as follows:

> [Decker] covenants and agrees that he shall not, directly or indirectly, disclose or disseminate, or encourage others to disclose or disseminate, any of the Confidential Information to any person or entity…[e]mployee also agrees that he will undertake all necessary and appropriate steps to insure (*sic*) that the secrecy of the Confidential Information in her (*sic*) possession or under her (*sic*) control will be maintained.[6]

(*Id.*, ¶ 50; Ex. A attached thereto at § 11.6.)

In determining whether to grant an injunction enforcing a restrictive covenant, courts

look to whether the covenant is reasonable. Weitekamp v. Lane, 250 Ill. App. 3d 1017, 1023

---

[5] A typographical error in the Agreement in the definition of "Competitive Activities" led to the inadvertent inclusion of "court reporting services," but clearly neither Eco Tec nor the defendants are engaged in such services, and Eco Tec does not seek to prevent defendants from engaging in such services.

[6] "Confidential Information," as defined in the Agreement, means "any and all proprietary or confidential information concerning the business, properties and operation of [Eco Tec]…including information, documents, materials and data which relate to business or marketing plans or strategies, computer systems…customer and vendor contracts, customers lists, customer information, vendor lists…products, prospect lists, resource lists, price lists or policies, costs, sales figures…trade secrets…and all information, documents, materials and data received by [Eco Tec]…from third parties required to be held by [Eco Tec] in confidence…" (Verified Compl. at ¶ 50; Ex. A at § 11.5.)

(1993). The terms of the agreement must be reasonable and necessary to protect a "legitimate business interest" of the plaintiff. Label Printers v. Pflug, 206 Ill. App. 3d 483, 491 (1991). Courts customarily enforce restrictive covenants through injunctive relief if they are ancillary to valid contracts, supported by adequate consideration and are reasonable as to time and territory. Center for Sight of Central Illinois I, S.C. v. Deranian, 305 Ill. App. 3d 909, 915 (1999).

A "legitimate business interest" is present where either: (1) the employee acquired confidential information through his employment with the plaintiff and later attempted to use it for his own gains; or (2) the employer's customer relationships are near permanent and the employee would not have had contact with the customer absent his employment. A.J. Dralle, Inc. v. Air Technologies, Inc., 255 Ill. App. 3d 982, 991 (1994). Here, Decker acquired confidential information through Eco Tec and is now about to use it to his and Smart Sealed's advantage. Moreover, Eco Tec's customer relationships are near-permanent and Decker would not have gained access to those relationships but-for his employment.

The restrictive covenants at issue here are both reasonable in time (two years) and geographical scope (Illinois and two neighboring states). *See, e.g.* Health Prof., Ltd. v. Johnson, 339 Ill. App. 3d 1021, 1036 (Ill. App. Ct. 2003) ("The courts of [Illinois] have repeatedly upheld 3-year restrictions as reasonable") (*omitting citations*); Aspen Mktg. Servs. v. Russell, 2009 U.S. Dist. LEXIS 112982, *11 (N.D. Ill. Dec. 3, 2009) (enforcing a nationwide non-competition covenant); citing Gorman Publ'g Co. v. Stillman, 516 F. Supp. 98, 104 (D.C. Ill. 1980) (same); Loewen Group Int'l v. Haberichter, 1998 U.S. App. LEXIS 28514, *20 (7th Cir. Nov. 9, 1998). Accordingly, Eco Tec demonstrates a likelihood of success in proving Decker's violation of the Agreement by his exploitation of Eco Tec's confidential and proprietary trade secrets for his own advantage and to the benefit of Smart Sealed.

**B.**     **Eco Tec Has No Adequate Remedy At Law And Will Be Irreparably Harmed**

No adequate remedy at law exists for Eco Tec. An injury is "irreparable" when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard. Meridian Mut. ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1120 (7th Cir. 1997); see also Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n o/St. Louis, 35 F.3d 1134, 1140 (7th Cir. 1994) ("showing injury to goodwill can constitute irreparable harm"). Illinois law also recognizes that ongoing competition, even in the absence of lost sales, serves as a sufficient basis for equitable relief. Hess Newmark Owens Wolf, Inc. v. Owens, 415 F.3d 630, 633 (7th Cir. Ill. 2005); citing Gold v. Ziff Communications Co., 196 Ill. App. 3d 425, 434 (1st Dist.1989). Money damages would be inadequate here for at least two reasons. First, since its inception, Eco Tec has expended a significant amount of time and money to develop and maintain customers and cannot place a monetary value on the impact of the loss of this investment or the potential for lost sales in the future. Second, at this juncture, Eco Tec is not yet aware of the full scope of what information Decker took with him to use at Smart Sealed. Accordingly, the Court should issue an injunction to protect Eco Tec from irreparable harm.

**C.**     **The Balance Of Harm Weighs In Favor Of Eco Tec**

The court should apply a "sliding-scale approach" in balancing the harm in this case "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." In re Aimster Copyright Litigation, 252 F. Supp. 2d 634, 648 (N.D. Ill. 2002). The injunctive relief Eco Tec seeks will merely prohibit Decker and Smart Sealed from using and exploiting the illegally obtained information, *i.e.* ensure that Decker and Smart Sealed abide by their pre-existing legal obligations. The defendants' self-interest in

14

avoiding such obligations pales in comparison to Eco Tec's interests in preserving its customer base and the confidentiality of its trade secrets. Thus, in order to maintain the *status quo ante*, the Court should enter a temporary restraining order that enjoins Decker from commencing work for Smart Sealed or other competitors of Eco Tec and prevents Decker and Smart Sealed from using confidential, proprietary and trade secret information belonging to Eco Tec.

### D.       An Injunction Will Serve The Public Interest

The public maintains a significant interest in preventing unfair competition brought on by the pilfering of confidential business information and trade secrets. The public does not benefit if unethical business conduct is rewarded. IDS Life Ins. Co. v. SunAmerica. Inc., 958 F. Supp. 1258, 1281 (N.D. Ill. 1997).

### CONCLUSION

For the reasons stated above, Eco Tec respectfully asks this Court to enter a temporary restraining order enjoining Tom Decker from commencing work for Smart Sealed or any other competitor of Eco Tec's and enjoining Decker and Smart Sealed from using any confidential, proprietary or trade secret information belonging to Eco Tec.

Dated: April 22, 2010                                    Respectfully Submitted,

                                                         **ECO TEC INSULATION, INC.**

                                                         By:   /s/ Steven L. Baron
                                                             One of its attorneys

Steven P. Mandell (ARDC #6183729)
Steven P. Baron (ARDC #6200868)
John D. Fitzpatrick (ARDC #6277475)
MANDELL MENKES LLC
333 West Wacker Drive, Ste. 300
Chicago, IL  60606
Tel:  (312) 251-1000

15