# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

**APRIL 29, 2010**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| ECO TEC INSULATION, INC., an<br>Illinois Corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-02478 |
| | ) | |
| TOM DECKER; and, SMART SEALED<br>INSULATION, LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT SMART SEALED INSULATION, LLC'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

I.    FACTS ........................................................................................................ 1

II.    ARGUMENT ............................................................................................. 2

A.    Eco Tec Is Unlikely To Prevail On The Merits Of Its Claim That Smart Sealed, LLC Has Misappropriated Trade Secrets In Violation Of The Illinois Trade Secrets Act, And, Therefore, Its Request For A Temporary Restraining Order Based On Count III Should Be Denied ........................................................ 3

1.    Eco Tec is Unlikely to Prevail on the Merits of its Claim that its "Customer Files, Architect and General Contractor Files and Bidding Materials" are Trade Secrets as Defined Under the ITSA ......................... 4

a.    Eco Tec is unlikely to prevail on the merits of its claim that its "customer files" are trade secrets.................................................... 4

(1)    Eco Tec is unlikely to prevail on the merits of its claim that its "customer lists" and "lists of potential customers" are trade secrets................................................. 5

(2)    Eco Tec is unlikely to prevail on the merits of its claim that its "customer contact file" is a trade secret.................. 8

b.    Eco Tech is unlikely to prevail on the merits of its claim that its "architect and general contractor files" are trade secrets ......... 10

(1)    Eco Tec is unlikely to prevail on the merits of its claim that its "architect files" are trade secrets........................... 10

(2)    Eco Tec is unlikely to prevail on the merits of its claim that is "general contractor files" are trade secrets............. 12

c.    Eco Tec is unlikely to prevail on the merits of its claim that its "bidding materials" are trade secrets ........................................... 12

(1)    Eco Tec is unlikely to prevail on the merits of its claim that bidding materials submitted to its customers are trade secrets.................................................................... 12

(2)    Eco Tec is unlikely to prevail on the merits of its claim that bidding materials consisting of email bid requests received by it are trade secrets .......................................... 14

(3)    Eco Tec is unlikely to prevail on the merits of its trade secrets claim based on information on the bidding process Eco Tec followed on current customer projects .. 15

B.     Eco Tec Is Unlikely To Prevail On The Merits Of Its Trade Secrets Claim Because It Has Not Alleged Specific Facts Establishing That It Took Reasonable Steps To Maintain The Confidentiality Of Its Information ............... 16

C.     Eco Tec Is Not Likely To Prevail On The Merits Of Its Claim That Smart Sealed Engaged In Actual Or Threatened Misappropriation ................................ 17

D.     Nothing In Eco Tec's Emergency Motion For Temporary Restraining Order And Injunctive Relief Or Supporting Memorandum Of Law Establishes That Eco Tec Is Likely To Prevail On The Merits Of Its ITSA Claim Against Smart Sealed ........................................................................................................ 17

E.     The Allegations Regarding Tortious Interference With Contract Does not Warrant Injunctive Relief ........................................................................ 19

     1.     Smart Sealed Acted with Justification ...................................................... 20

     2.     The Agreement is not Enforceable Based on Applicable Legal Principles Addressing Restraints on Competition ..................................... 20

F.     The Provision As Drafted Cannot Be Modified or "Blue-Penciled" To Create A Less Restrictive Covenant............................................................................... 24

III.     CONCLUSION ............................................................................................................. 26

## TABLE OF AUTHORITIES

**Cases**

Abbott-Interfast Corp. v. Harkabus, U.S. 250 Ill. App. 3d 13, 18 (2nd Dist. 1993) ............... 21, 25

Alpha School Bus Company, Inc. v. Wagner, 391 Ill. App. 3d 722 (1st Dist. 2009) ................. 7, 9

Applied Industrial Materials Corp v. Brantjex, 891 F. Supp. 432 (N.D. Ill. 1994) ...................... 15

Arpac Corp. v. Murray, 226 Ill. App. 3d 65, 73 (1st Dist. 1992) ................................. 20, 21, 23, 24

Audio Properties Inc. v. Kovach, 275 Ill. App. 3d 145, 655 N.E. 2d 1034 (1st Dist. 1995) ........ 21

Brooks v. Ross, 578 F.3d 574 (June 4, 2009, 7th Cir.) ................................................................. 19

Carbonic Fire Extinguishers v. Heath, 190 Ill. App, 3d 948, 952-53 (2nd Dist. 1989).... 5, 6, 8, 10

Del Monte Fresh Produce, N.A. Inc. v. Chiquita Brands International, Inc., 616 F. Supp. 2d
805 (N.D. Ill. 2009) ............................................................................................................. 13

Delta Med. Sys. V. Mid-America Med. Sys., 331 Ill. App. 3d 777, 791 (1st Dist. 2002).............. 9

Eichman v. Nat'l Hospital & Healthcare, 308 Ill. App. 3d 337 (1st Dist. 1999)......... 22, 23, 25, 26

Fleming Sales Co. v. Bailey, 611 F. Supp. 507, 509 (N.D. Ill. 1985) .............................. 5, 7, 8, 11

Grand Vehicle Works Holdings Corp. v. Frey, 2005 U.S. Dist. LEXIS 13629 (N.D. Ill., July
8, 2005) .......................................................................................................................... 22, 26

Hamer Holding Group v. Elmore, 202 Ill. App.3d 994, 1001 (1st Dist. 1990) .............................. 9

Kinney v. Federal Security, Inc., 2001 U.S. Dist. LEXIS 2301, *4 n. 2, Case No. 01 C 0838
(N.D. Ill. March 6, 2001) ...................................................................................................... 17

Lawrence & Allen v. Cambridge Human Res. Group, Inc., 292 Ill. App. 3d 131, 137 (2nd
Dist. 1997) ..................................................................................................... 20, 22, 23, 25

Lee/O'Keefe Insurance Agency v. Ferega, 163 Ill. App. 3d 997, 1005 (4th Dist. 1987)........ 23, 24

McCann Construction Specialties Co. v. Bosman, 44 Ill. App, 3d. 1020, 1023 (2nd Dist.
1977) .......................................................................................................................... 5, 7, 8, 12

Motorola v. Lemko, 609 F. Supp. 2s 760 (N.D. Ill. 2009) ................................................... 18, 19

Nobel Biocare USA v. Lynch, 1999 U.S. Dist. LEXIS 23252, 1999 WL 958501, at *2 (N.D.
Ill. Sept. 16, 1999) ............................................................................................................... 26

OfficeMates 5, Northshore, Inc. v. Hazen, 234 Ill. App. 3d 557, 575 (1st Dist. 1992).......... 5, 6, 8

Pactiv Corp. v. Menasha Corp., 261 F. Sup. 2d 10099, 1016-17 (N.D. Ill. 2003) ...................... 26

Reinhardt Printing Co. v. Feld, 142 Ill. App. 3d 9 (1st Dist. 1986)............................................. 20

Stampede Tool Warehouse v. May, 272 Ill. App.3d 580 (1st Dist. 1995) ................................... 16

System Development Services, Inc. v. Haarmann 389 Ill. App. 3d 561 (5th Dist. 2009) ....... 5, 6, 8

Thomas & Betts Corp v. Panduit Corp., 76 F. Supp. 2d 917, 918 (N.D. Ill. 1999)........................ 5

Trailer Leasing Co. v. Associates Commer. Corp., 1996 U.S. Dist. LEXIS 9654, 1996 WL
    392135, at *4 (N.D. Ill. July 10, 1996)................................................................................ 26

X-it Products, L.L.C. v. Walter Kidde Portable Equipment, Inc., 155 F. Supp. 2d 577, 642
    (E.D. Va. 2001)....................................................................................................................... 6

Plaintiff Eco Tec Insulation, Inc. ("Eco Tec") seeks to restrain Defendant Smart Sealed Insulation, LLC ("Smart Sealed") from employing Defendant Tom Decker in any capacity, based on an overbroad and unenforceable non-competition clause in Decker's employment agreement with Eco Tec, and Eco Tec's alleged fears Decker and/or Smart Sealed will "misappropriate" Eco Tec's trade secrets by hiring Decker. However, Eco Tec's Complaint contains no facts alleging that Smart Sealed has taken, seen, removed, considered, or become aware of in any manner, let alone "misappropriated" (or threatened to misappropriate) any information of Eco Tec. Moreover, the Complaint does not identify any information that rises to the level of a recognized trade secret. Thus Eco Tec has not established any likelihood of success against Smart Sealed and its request to enjoin Smart Sealed should be denied in its entirety.

## I.   FACTS

Eco Tec is in the business of selling and installing foam insulation in residential homes and commercial structures. (Compl. par. 4) Not one fact is alleged even remotely suggesting that any customer of Eco Tec is a "repeat" customer and there is no assertion that any customer has been a customer for *any* continuous time period or duration. Eco Tec merely asserts that there is a "possibility" it may provide future supplementary installation for its customers. (*Id.* par. 8) Contrary to any claim that Eco Tec has an established customer base that uses its product on a regular basis, at most, Eco Tec concedes it merely "expects" a customer will remain a customer. (*Id.*)

The employment agreement between Decker and Eco Tec (Compl. Ex. A) is overbroad and unenforceable because it would purport to prohibit Decker for two years from working in geographic areas where Eco Tec does not operate (*i.e.*, the portion of Wisconsin outside of "southern" Wisconsin and the portion of Indiana outside "northern" Indiana (see Compl. par. 4) and in industries in which Eco Tec does not operate (*i.e.*, court reporting services). More

1

important, it would bar Decker from being employed rather than protect any legitimate interest of Eco Tec:

> 11.3    For the period beginning on the date of this Agreement and ending on the date two (2) years after the Termination Date (the "Non-Competition Period"), Employee shall not, without the prior written consent of the Employer, which the Employer may grant or withhold in its sole discretion:
>
> > 11.3.1 engage in any Competitive Activities. . .

The term "Competitive Activities" is defined as:

> "Competitive Activities" shall mean either:  (i) directly or indirectly *be employed* or retained by a person or entity, which provides insulation products and/or services or competes with Employer in the states of Illinois, Wisconsin or Indiana;
>
> > *            *            *
>
> and/or (iii) perform similar services or duties as Employee performed for Employer during the Term of Employment for any person, business or entity, which provides *court reporting services* or competes with Employer in the state of Illinois, Wisconsin or Indiana. (emphasis supplied.)

Thus, these provisions, *on their face*, are focused entirely on either eliminating competition or preventing Decker from earning a living in the insulation business -- even as a janitor (and as a court reporter).[1]

## II.    **ARGUMENT**

The only counts in the Verified Complaint directed against Smart Sealed are Counts III (Misappropriation of Trade Secrets in Breach of the Illinois Trade Secrets Act) and Count VI (Tortious Interference with Contract under Illinois Common Law).  In Count III, Eco Tec does not identify a single fact even suggesting that Smart Sealed misappropriated or threatened to

---

[1]    It would appear that Eco Tec, rather than draft a narrowly tailored agreement, must have "cut and pasted" a document involving another industry.

misappropriate any information belonging to Eco Tec. Thus, Eco Tec's trade secret claim against Smart Sealed is fatally defective for this reason alone.

In Count VI, Eco Tec claims Smart Sealed tortiously interfered with the employment agreement between Eco Tec and Decker because it ". . .offer[ed] Decker a position at Smart Sealed. . ." and "without justification" offered him a job "in any capacity." (Compl. par. 84) As demonstrated below, the employment agreement is not designed to protect any legitimate interest of Eco Tec and is wholly unenforceable on its face.

**A.    Eco Tec Is Unlikely To Prevail On The Merits Of Its Claim That Smart Sealed, LLC Has Misappropriated Trade Secrets In Violation Of The Illinois Trade Secrets Act, And, Therefore, Its Request For A Temporary Restraining Order Based On Count III Should Be Denied**

Count III is the basis for Eco Tec's claim for a temporary restraining order against Smart Seal under the Illinois Trade Secrets Act ("ITSA"). In Count III Eco Tec alleges that its trade secrets consist of "customer files, architect and general contractor files and bidding materials." (Compl., par. 63). Specifically, Eco Tec alleges:

> The confidential customer files, architect and general contractor files and bidding materials as set forth more fully in paragraphs 18 and 33 above were provided to Decker by Eco Tec and constitute trade secrets under the ITSA.

(*Id.*) Eco Tec further alleges that Smart Seal has misappropriated those trade secrets (*Id.* at 66).

However, Eco Tec is not likely to prevail on the merits of this claim because the verified allegations of the complaint do not raise a fair question as to:

- (1) Whether the "customer files, architect and general contractor files and bidding materials" are "sufficiently secret to derive economic value . . . from not being generally known to other persons who can obtain economic value" from them, as required to establish a trade secret under the Illinois Trade Secrets Act ("ITSA") 765 ILCS 1065/2(1);

- (2) Whether the "customer files, architect and general contractor files and bidding materials" were the subject of efforts that were "reasonable under the circumstances to maintain [the] secrecy or confidentiality of this information"

as required to establish a trade secret under the ITSA 765 ILCS 1065/2(2); and

- (3) Whether Smart Sealed engaged in actual or threatened "misappropriation" of the "customer files, architect and general contractor files and bidding materials" as defined under the ITSA 765 ILCS 1065/2, 3.

For these reasons, which are discussed in greater detail below, Eco Tec's motion for a temporary restraining order against Smart Sealed under its claim in Count III of its Complaint for "Misappropriation of Trade Secrets Against . . . Smart Sealed" should be denied.

1. **Eco Tec is Unlikely to Prevail on the Merits of its Claim that its "Customer Files, Architect and General Contractor Files and Bidding Materials" are Trade Secrets as Defined Under the ITSA**

    a. **Eco Tec is unlikely to prevail on the merits of its claim that its "customer files" are trade secrets**

As noted above, Eco Tec alleges in Count III that its "customer files, architect and general contractor files and bidding materials" are the alleged trade secrets at issue and that the facts supporting those are set forth in paragraphs 18 and 33 of its complaint. (Compl. par. 63). With regard to the alleged "customer files," Paragraph 18 alleges that Eco Tec gave Decker certain "customer . . . materials" which Eco Tec claims included "customer accounts," (*Id.* at 18A) and "potential customer lists" (*Id.* at 18B). Paragraph 33 references "a customer contact file created for exclusive use by the sales team to help the salespersons cultivate relationships with current and prospective customers" (*Id.* at 33B) and a SIM card containing, *inter alia*, "contact data of prospective clients created by Eco Tec's sales team, including Decker." (*Id.* at 33F). Thus, the threshold question the Court must decide is whether Eco Tec is likely to prevail on its claim that the foregoing pieces of information, i.e., customer lists, customer contact information, lists of prospective customers, etc., are "sufficiently secret to derive economic value . . . from not being generally known to other persons who can obtain economic value" from them, as required to establish a trade secret under 765 ILCS 1065/2(1) of the ITSA. For the

4

reasons set forth below, the Court should find that Eco Tec has failed to demonstrate it is likely to prevail on its claim that the foregoing customer information is a trade secret, based on the allegations of the Complaint.

> **(1)  Eco Tec is unlikely to prevail on the merits of its claim that its "customer lists" and "lists of potential customers" are trade secrets**

Illinois courts have consistently held that customer lists and lists of potential customers: are not trade secrets where they contain information that can be readily compiled through normal competitive efforts, such as canvassing, making phone calls, contacting employees, etc., and have further held that it is the party who asserts that such a list is a trade secret who bears the burden of presenting evidence establishing that the former employee would not have known about the entities on the facts but for his exposure to it. <u>System Development Services, Inc. v. Haarmann</u> 389 Ill. App. 3d 561 (5th Dist. 2009) (customer list for company involved in the computer business not a trade secret); <u>OfficeMates 5, Northshore, Inc. v. Hazen</u>, 234 Ill. App. 3d 557, 575 (1st Dist. 1992) (customer list of personnel placement agency not a trade secret); <u>Carbonic Fire Extinguishers v. Heath</u>, 190 Ill. App, 3d 948, 952-53 (2nd Dist. 1989) (Appellate Court reverses trial court's issuance of an injunction, holding that customer list for a company that sold and serviced fire extinguishes and cleaned restaurant hoods is not a trade secret); <u>McCann Construction Specialties Co. v. Bosman</u>, 44 Ill. App, 3d. 1020, 1023 (2nd Dist. 1977) (construction company's list of customers not a trade secret); <u>Fleming Sales Co. v. Bailey</u>, 611 F. Supp. 507, 509 (N.D. Ill. 1985) (customer list for company engaged in business of manufacturing recreational vehicles not a trade secret); *see* <u>Thomas & Betts Corp v. Panduit Corp.</u>, 76 F. Supp. 2d 917, 918 (N.D. Ill. 1999) (lists of potential customers have been held not to be a trade secret because "there is nothing to suggest that the identity of potential customers is a mystery, unknown to those with experience in the industry and not capable of being known

except through the appropriation of trade secrets"); see also X-it Products, L.L.C. v. Walter Kidde Portable Equipment, Inc., 155 F. Supp. 2d 577, 642 (E.D. Va. 2001) (applying Illinois law) (potential customers not trade secrets where names "are matters of public knowledge").

In Systems Development, the Appellate Court held that a customer list comprised of business information available through "normal competitive means" and which is not "kept from the general public" is not a trade secret:

> In today's modern world, computers and computer networks are common business tools, and all businesses are potential customers of computer network services. Locating potential customers is merely a matter of identifying business in a particular town, county, or area and looking up their contact information. This information is easily obtained from telephone directories, chamber of commerce directories, the Internet, and a variety of other sources. *Where customer information is readily available to competitors through normal competitive means, no protectible interest exists. A trade secret must be something kept from the general public and not susceptible to common knowledge.*

389 Ill. App. 3d at 575 (emphasis supplied).

In Officemates 5, the Appellate Court held that a customer list comprised of information available by "canvassing" or by "placing a cold call" and "asking specific questions" is not a trade secret:

> Information readily available to anyone in the business capable of canvassing or finding a directory, whether it be the Yellow Pages or a specialized directory, *placing a cold call* to that business *and asking specific questions* designed to elicit the information

OfficeMates 5 at 575 (emphasis supplied).

In Carbonic Fire Extinguishers, the Appellate Court held that a customer list comprised of contact and pricing information that could be obtained by contacting companies listed in the telephone directory is not a trade secret:

> Although the actual customers using plaintiff's services are not readily apparent from the telephone directory, anyone seeking to compete with plaintiff, including defendant, could very likely encounter plaintiff's

customers by simply contacting restaurants through the telephone directory.

Carbonic Fire Extinguishers, 190 Ill App. At 953.

In McAnn Construction Specialties Co. v. Bosman, 44 Ill App. 3d 1020, 1023 (2nd Dist. 1977) the Appellate Court held that a construction supply company's customer list was not a trade secret where there was no proof that a party that looked these entities up in directories and contacted them could not have developed the same information:

> There was no proof that the names on the list were not publicly available to anyone by use of, or reference to, the yellow pages of the telephone directory or trade directories in the area served by the parties" [and the list contained] names of well-known contractors, utility companies [,] and various park districts and municipal bodies.

McCann Construction, 44 Ill. App. 3d at 1023-24.

In Fleming Sales Co. v. Bailey, 611 F. Supp. 507, 509 (N.D. Ill. 1985), the Court held that a manufacturer's customer list was not a trade secret where the Plaintiff had failed to produce evidence that the Defendant "sought to pursue customers [that the employee] would not have discovered without [the employee's exposure to] the employer's customer list." Id. at 513.

In Alpha School Bus Company, Inc. v. Wagner, 391 Ill. App. 3d 722 (1st Dist. 2009) the plaintiff, a provider of special education bus transportation for various school districts, alleged that their customer list, consisting of the names of school districts and the contract and bid date, was a trade secret. 391 Ill. App. 3d at 733 The trial court, holding that the customer list was not a trade secret, granted a motion to dismiss and the Appellate Court affirmed. In so doing the Appellate Court noted the fact that the list of school districts at issue included non-public information, such as "the number and type of vehicles used" and "student attendance and days of attendance" did not make the list a trade secret, as this information was also available either from public sources or simple observation.

In sum, therefore, a customer list is not a trade secret where it contains information that is not "kept from the public" and which can be found "by normal competitive means" (<u>Systems Development</u> slip op at 17-18), such as "canvassing" or "making a cold call" to a company in the "Yellow Pages" or a "specialized directory" and "asking specific questions" (<u>OfficeMates 5</u> at 575; <u>Carbonic Fire Extinguishers</u> at 953), or where the names of the customers are well known, such as the names of "well-known contractors, utility companies, and various park districts and municipal bodies" (<u>McCann Construction</u> at 1023-24), or where the information in the list could be easily compiled by resort to publicly available sources or by asking questions of employees or clients likely to have the information, even if that means following them in their travels. (<u>Wagner</u>, slip op at 24) ***Further, it is the Plaintiff's burden to establish that the Defendant would not have discovered the customers "without exposure to [the] list."*** <u>Fleming Sales Co.</u> 611 F. Supp. at 513.

Here, Eco Tec's verified complaint does not assert any specific facts establishing that the customers and prospective customers on the lists that it allegedly provided to Decker would not have been discovered by Decker or Smart Sealed Insulation without exposure to these lists. Therefore, Eco Tec is unlikely to prevail on the merits of its claim that these lists of customers and prospective customers are trade secrets under the ITSA. Plaintiff's request for a temporary restraining order against Smart Sealed Insulation based on these lists of actual or potential customers should, therefore, be denied.

> **(2)    Eco Tec is unlikely to prevail on the merits of its claim that its "customer contact file" is a trade secret**

Customer contact information that can be readily compiled by a competitor is not protectable under the ITSA.  See, e.g., <u>Carbonic Fire Extinguishers</u>, 190 Ill. App. 3d 948 at 953 (customer contact list is not a trade secret where the "names, addresses, and telephone numbers

of the various customers were readily obtainable from the yellow pages of the telephone directory"); Delta Med. Sys. V. Mid-America Med. Sys., 331 Ill. App. 3d 777, 791 (1st Dist. 2002) (medical supply company's customer contact list was not a trade secret where the names and contact information of the 72 hospitals and medical clinics could be derived by merely looking in the yellow pages."); Hamer Holding Group v. Elmore, 202 Ill. App.3d 994, 1001 (1st Dist. 1990) (customer contact list not a trade secret because it could be easily duplicated by reviewing lists of non-profits from Secretary of State's office, distilling it by geographic region, and updating contacts and telephone numbers). In Alpha School Bus Co. v. Wagner, the Appellate Court held that the list of the "names, addresses and phone numbers of [Plaintiff's] drivers" was not a trade secret, because this information could be easily compiled by "following the . . . drivers on their routes and asking them for their contact information":

> It is beyond dispute that people outside of plaintiffs' business, as well as other employees in plaintiff's business, would know the drivers' names, addresses and phone numbers, which weigh against plaintiffs' claim of trade secrecy. Also weighing against plaintiffs' contention is the fact the information could be very easily acquired by competitors seeking to hire drivers simply by following the plaintiffs' drivers on their routes and asking them for their contact information.

391 Ill. App. 3d at 1153.

Here, Eco Tec's verified complaint does not allege specific facts establishing that the contact information for the current and prospective customers on its lists could not be obtained from public sources, such as the yellow pages, the internet, industry guides, etc., or by other methods such as making phone calls, canvassing or conducting interviews. Thus, insofar as Eco Tec's customer contact file consists of such contact information, Eco Tec is unlikely to prevail on its claim that its customer contact information is a trade secret, and, therefore, Eco Tec's request for a temporary restraining order based on any alleged misappropriation of its customer contact information should be denied.

9

Eco Tec also alleges that the customer contact file "represents an important part of Eco Tec's marketing strategy, outlining Eco Tec's overall marketing objectives and included leads sent to salesmen over the past year." (Compl. par. 33B) Eco Tec does not explain what it means when it says the customer contact file is somehow "outlining marketing objectives." Eco Tec does not allege that the file contains an actual outline of marketing objectives, nor does it provide the court with sufficient facts so that it can evaluate whether such objectives (or an outline of them) provide value to Eco Tec from being secret. Thus, Eco Tec is unlikely to prevail on the merits of its trade secrets claim against Smart Sealed based on this allegation.

Eco Tec's allegation that the customer contact file includes "leads sent to salesmen over the past year" (Compl. par. 33(B)) is also insufficient to provide relief under the ITSA. Leads are, by their nature, not secret, as they consist of communications from potential customers to Eco Tec. Both the customer and Eco Tec are aware of the lead information, and absent an allegation that the potential customer is somehow prevented from disclosing the information that it has given to Eco Tec, the information is not a trade secret. *See* Carbonic Fire Extinguishers, Inc. v. Heath, 190 Ill. App.3d 948 (2nd Dist. 1989) (holding that pricing information given to a customer that the customer is at liberty to divulge is not a trade secret). Thus, Eco Tec is unlikely to prevail on the merits of its trade secrets claim against Smart Sealed based on this allegation.

### b. Eco Tech is unlikely to prevail on the merits of its claim that its "architect and general contractor files" are trade secrets

#### (1) Eco Tec is unlikely to prevail on the merits of its claim that its "architect files" are trade secrets

Eco Tec does not list architects among its customers, which Eco Tec alleges "include residential homeowners, small businesses, municipalities, and major for profit and non-for-profit corporations and entities." (Compl. par. 7) Eco Tec alleges that architects are one of its sources of potential referrals, making allegations about "architectural firms that might result in referral

10

business" (*Id.* at par. 15), and "architects and other potential sources of referrals." (*Id.* at par. 18) Eco Tec says little about the content of the "architect file," alleging only that the file "represents a complete overview of all architects Eco Tec interacts with and was distributed to a distinct group of Eco Tec's owners and the sales team. All such individuals were required to feed their input into the file data." (*Id.* at par. 33C)

Thus, the only specific facts that Eco Tec alleges about the "architect file" is that it is a list of potential referral sources that was distributed to Eco Tec's owners and sales persons and that such recipients had input into the file. These allegations are insufficient for the Court to conclude that Eco Tec is likely to prevail on the merits of its claim that this list of potential referral sources is a trade secret. Because the law requires a party asserting trade secret protection over its customer list to come forward with evidence establishing that the Defendant would not have discovered the customers "without exposure to [the] list," <u>Fleming Sales Co.</u> 611 F. Supp. at 513, then, *a fortiori,* a party asserting trade secret protection in a list of entities that may potentially *refer* customers to it likewise have to come forward with specific facts establishing that Smart Sealed would not have discovered the potential referral sources without exposure to the Eco Tec's list. Here, no such specific facts are alleged. Moreover, it is unlikely that Plaintiff could do so inasmuch as the list of licensed architects can be obtained from the State of Illinois, which has established the licensing requirements for architects, 225 ILCS 305/1 *et seq.* Thus, Eco Tec is not likely to prevail on the merits of its claim that its architect list is a trade secret and, therefore, Eco Tec's request for a temporary restraining order against Smart Sealed, LLC, based on any alleged misappropriation of Eco Tec's architect list should be denied.

   **(2) Eco Tec is unlikely to prevail on the merits of its claim that its "general contractor files" are trade secrets**

  Eco Tec alleges that its "general contractor file" is a list of general contractors who are potential referral sources. Specifically, Eco Tec alleges that this file "contains a list of key general contractors with whom Eco Tec communicates for different business purposes, such as obtaining referrals and additional contacts in the industry." (Compl. par. 33D) Although general contractors, unlike architects, are not licensed by the State of Illinois, the Court may take judicial notice of the fact that a list of such contractors is easily available from professional directories. See, e.g., www.buildingtradesdir.com Further, Eco Tec's verified complaint fails to allege specific facts establishing that Smart Sealed would not have known the identities and contact information of such general contractors absent any alleged access to Eco Tec's list. *See* McAnn Construction Specialties Co. v. Bosman, 44 Ill App. 3d 1020, 1023 (2nd Dist 1977) (no trade secret where list included well known contractors that could be looked-up in industry directories). Thus, Eco Tec is unlikely to prevail on its claim that its file of the general contractors who are potential referral sources is a trade secret and, therefore, Eco Tec's request for a temporary restraining order against Smart Sealed based on any misappropriation of Eco Tec's general contractor list shall be denied.

   **c. Eco Tec is unlikely to prevail on the merits of its claim that its "bidding materials" are trade secrets**

   **(1) Eco Tec is unlikely to prevail on the merits of its claim that bidding materials submitted to its customers are trade secrets**

  Eco Tec's allegation that its "bidding materials" are trade secrets is without merit insofar as it refers to bidding materials given to customers, because there are no facts alleged that Eco Tec's customers are required to keep the bid confidential. This Court has recently noted that

information that is given to a customer, such as price (i.e., "bid") information is not a trade secret

where the customer is not obliged to keep the information confidential:

> [T]he Illinois appellate courts which have addressed the issue have consistently held that price information which is disclosed by a business to any of its customers . . . does not constitute trade secret information protected by the Act. *Applied Indus. Materials Corp. v. Brantjes*, 891 F. Supp. 432, 437-38 (N.D. Ill. 1994); *Carbonic Fire Extinguishers, Inc. v. Heath*, 190 Ill. App.3d 948, 547 N.E. 2d 675, 678 (Ill. App.Ct. 1989) (holding that pricing information given to a customer that the customer is at liberty to divulge is not a trade secret). For example, in *Trailer Leasing*, the court declined to find that pricing information was a trade secret:
>
>> It is also unclear as to why general rate information constitutes a trade secret. By all accounts, this is a highly competitive business, and it is unlikely that rate information is ever secret, and if so, that it remains secret for very long. If competitor "A" gives a customer an advantageous rate, it will not be long before the customer shops that rate around and tries to get competitor "B" to go even lower, that is the nature of a competitive market.
>
> *Trailer Leasing Co. v. Associates. Commer. Corp*, 1996 U.S. Dist. LEXIS 11366, at *3 (N.D. Ill. Aug. 8 1996). There is no indication that Del Monte's customers were prohibited from divulging the prices they paid for bananas. There is no indication Kinnavy misappropriated a pricing formula. As such, the Court finds that price information alone cannot constitute a trade secret.

<u>Del Monte Fresh Produce, N.A. Inc. v. Chiquita Brands International, Inc.</u>, 616 F. Supp. 2d 805

(N.D. Ill. 2009). Although this Court in <u>Del Monte</u> subsequently granted a motion to reconsider

on the above-quoted ruling on procedural grounds (the above quoted ruling was issued before the

close of discovery and Del Monte argued after the ruling was entered that it should be allowed to

take discovery and present evidence to support its trade secret claim), the decision remains an

accurate statement of Illinois law, which holds that, absent a non-disclosure agreement between a

company and its customer, information that is given to a customer is not a trade secret. Here,

there is no such agreement alleged between Eco Tec and its customers. Thus, Eco Tec is

unlikely to prevail on the merits of its claim that its "bidding materials" are trade secrets insofar

as these materials consist of pricing and other bid materials submitted to the customer. Therefore, the Court should deny Eco Tec's request for a temporary restraining order against Smart Sealed insofar as it is based on any allegation that Smart Sealed misappropriated any pricing or other bidding information that Eco Tec submitted to its customers.

          (2)      **Eco Tec is unlikely to prevail on the merits of its claim that bidding materials consisting of email bid requests received by it are trade secrets**

Eco Tec alleges that its bidding materials include "leads emailed to Eco Tec through its 'Blue Book' network or other large networks that request group bids for multiple projects." (Compl. par. 33A). Eco Tec does not explain what its "Blue Book" network is. If the "Blue Book" network and the "other large networks that request group bids for multiple projects" are networks of third parties that send Eco Tec requests to submit bids to spray foam on the walls of such projects for these third parties, then Eco Tec would have to have a non-disclosure agreement with these third parties for the substance of these emails to be a trade secret. No such agreement is alleged. Further, the Court may take judicial notice of the fact that requests for bids are typically issued as part of a competitive bidding process, which would mean that entities other than Eco Tec receive the same email bid requests. If this is true, the e-mail bid requests are not trade secrets of Eco Tec. Thus, it is unlikely that Eco Tec will prevail on the merits of its claim that its bidding materials are trade secrets insofar as such materials consist of the email bid requests described in the Complaint. Therefore, the Court should deny Eco Tec's request for a temporary restraining order against Smart Sealed insofar as it is based on any allegation that Smart Sealed misappropriated any bidding materials consisting of email bid requests received from any third parties.

**(3)** **Eco Tec is unlikely to prevail on the merits of its trade secrets claim based on information on the bidding process Eco Tec followed on current customer projects**

Eco Tec alleges that its files contain information about the "bidding process followed on numerous current customer projects . . . so that salespersons would understand the project costs and profit margins on each project." (Compl. par. 33A)  As noted above, insofar as this bidding information is information that is received from or disclosed to the client, Eco Tec is unlikely to prevail on the merits of the claim because under Illinois trade secret law it is not secret.  Eco Tec does not allege that it provides its salespersons with actual project costs and profit margins, only that it provides them with information about the bidding process so that they can understand such costs and margins.  Moreover, even if Eco Tec's Complaint is construed as alleging that such cost and margin information is provided, there is no allegation that Eco Tec enters into any nondisclosure agreements with its vendors or undertakes any other reasonable steps to maintain the confidentiality of its cost information.  Thus, if Smart Sealed can find out Eco Tec's costs (and, thus its profit margins) by merely contacting Eco Tec's vendors, such cost and margin information is not a trade secret.  The myriad of cases cited above applying this same logic in the context of prices that can be discovered by calling Eco Tec's customers would likewise apply to preclude a trade secret finding where costs could similarly be found out (see Section A(1)(c) *supra* at pp. 13-14).  Further, there are no specific facts alleged establishing that such cost and margin information still has economic value.   It is well settled that in order for cost and profit margin information to be a trade secret, such information must not be out of date. Applied Industrial Materials Corp v. Brantjex, 891 F. Supp. 432 (N.D. Ill. 1994) (net profit information not a trade secret where plaintiff failed to establish that the information was not so outdated as to provide current economic value).  For these reasons, Eco Tec is unlikely to prevail on the merits of its claim that bidding materials based on current customers is a trade secret and, therefore,

15

insofar as Eco Tec's motion for a temporary restraining order is based on such information it should be denied.

### B.   Eco Tec Is Unlikely To Prevail On The Merits Of Its Trade Secrets Claim Because It Has Not Alleged Specific Facts Establishing That It Took Reasonable Steps To Maintain The Confidentiality Of Its Information

In <u>Stampede Tool Warehouse v. May</u>, 272 Ill. App.3d 580 (1st Dist. 1995), the Appellate Court made clear what constituted reasonable steps to maintain the confidentiality of information so as to qualify as a trade secret, and none of the factors found sufficient by the <u>Stampede Tool</u> court to hold information to be a trade secret are present here. In <u>Stampede Tool</u>, the hard copies of the information were placed in a locked office for which only the president and general manager had a key – there is no allegation of that here. In <u>Stampede Tool</u>, the president checked the garbage every day to make sure none of this information could be obtained by going through the garbage – there is no allegation of that here. In <u>Stampede Tool</u>, the salesperson's binders containing the information were locked up after every shift – there is no allegation of that here. In <u>Stampede Tool</u>, security cameras were installed to ensure the information was secured – there is no allegation of that here.[2] Here, the steps that Eco Tec took to keep its information confidential were to make it available to employees by computer on a need-to-know basis and to pay its employees consideration to keep such information confidential.[3] (Compl. par. 12) This does not meet the <u>Stampede Tool</u> standard. If such steps were sufficient, virtually any information merely stored on a computer would qualify as a trade secret. Thus, Eco Tec is unlikely to prevail on the merits of its trade secret claim against Smart Sealed because it has

---

[2] Although the Stampede Tool court found a customer list to be a trade secret, it did so only after first finding that the jobber tool market to be a "niche market" and that it cost $50,000/month to identify potential customers. Here, there is no such allegation of any kind.

[3] Eco Tec also alleges that it "restrict[ed] information available to competitors, customers and the general public" (Compl. par. 12), but information available to competitors, customers and general public is not, by its very nature, a trade secret.

failed to present facts establishing that it took reasonable steps to maintain the confidentiality of its information.

### C. Eco Tec Is Not Likely To Prevail On The Merits Of Its Claim That Smart Sealed Engaged In Actual Or Threatened Misappropriation

Most of the substantive allegations that Eco Tec makes against Smart Sealed are based on information and belief. (Compl. par. 19-21) Such allegations are impermissible for purposes of issuing a temporary restraining order. Kinney v. Federal Security, Inc., 2001 U.S. Dist. LEXIS 2301, *4 n. 2, Case No. 01 C 0838 (N.D. Ill. March 6, 2001). In Count III, Eco Tec makes the following summary allegation against Smart Sealed:

> Decker and Smart Sealed have misappropriated such trade secrets in violation of the ITSA. Smart Sealed had actual knowledge of Decker's misappropriation or, alternatively, had reason to know that Decker misappropriated the trade secrets.

(Compl. par. 63). This conclusion is certainly not sufficient to obtain a temporary restraining order, which requires Eco Tec to present facts establishing that it is likely to prevail on the merits of its ITSA claim against Smart Sealed. For this additional reason, Eco Tec is unlikely to prevail on the merits of its claim of trade secret violation against Smart Sealed.

### D. Nothing In Eco Tec's Emergency Motion For Temporary Restraining Order And Injunctive Relief Or Supporting Memorandum Of Law Establishes That Eco Tec Is Likely To Prevail On The Merits Of Its ITSA Claim Against Smart Sealed

There is nothing in Eco Tec's Emergency Motion for Temporary restraining Order and Injunctive Relief ("Motion") that establishes Eco Tec is likely to prevail on the merits of its claim against Smart Sealed under the ITSA. The only allegation that Eco Tec makes against Smart Sealed in its Motion is a summary allegation about Smart Sealed's alleged "inducement" of Decker to engage in "unlawful behavior" (Motion, para. 3). However, Eco Tec's Motion does not reference any specific facts from the Complaint to explain or otherwise establish that

such "inducement" of "unlawful behavior" actually occurred or is likely to do so. Thus, there is nothing in Eco Tec's Motion that would allow this Court to conclude that Eco Tec is likely to prevail on the merits of this alleged claim of "inducement" against Smart Sealed. Therefore, insofar as Eco Tec's Motion for temporary restraining order against Smart Sealed under the ITSA is based on these allegations in the Motion, it should be denied.

There is likewise nothing in Eco Tec's Memorandum in Support of Plaintiff's Emergency Motion For Temporary Restraining Order and Injunctive Relief ("Op Memo") that establishes Eco Tec is likely to prevail on the merits of its claim against Smart Sealed under the ITSA. In sum, the only substantive allegations Eco Tec makes against Smart Sealed in the Opposition Memorandum are: (1) Representatives of Smart Sealed once met with co-defendant Decker (Op. Memo, para. 4-5), (2) Eco Tec believes that Decker plans to go to work for Smart Sealed (Op. Memo, p. 7), and, (3) Based on nothing more than this meeting and Eco Tec's belief about Decker's plans, Eco Tec concludes that Smart Sealed had "constructive knowledge of [Decker's] scheme" "to abscond with [Eco Tec's] trade secrets." (Op. Memo p. 11) The Court cannot conclude that Eco Tec is likely to prevail on the merits of its claim against Eco Tec under the ITSA based on such meager facts and Eco Tec's beliefs and conclusions. Moreover, Eco Tec presents no case law that supports its assertion that merely meeting with an employed individual who allegedly had access to his employer's trade secrets constitutes a violation of the ITSA.

Moreover, Eco Tec's motion for TRO against Smart Sealed under the ITSA is not saved by its footnote argument noting that a complaint that alleges a trade secret violation will not be dismissed under Fed. R. Civ. P. 12 (b)(6) if it does not "plead highly specific facts" citing Motorola v. Lemko, 609 F. Supp. 2s 760 (N.D. Ill. 2009). Motion, p. 11, fn 4. First, the Motorola decision was issued prior to the Supreme Court's decision in Ashcroft v. Iqbal, ____

18

U.S. \_\_\_\_, 129 S. Ct. 1937 (2009), which redefined the proper standard for fact pleading on a motion to dismiss and, therefore, <u>Motorola</u> may no longer be good law. Second, a plaintiff that seeks to avoid dismissal under Fed. R. Civ. P. 12(b)(6) is, even after <u>Iqbal</u>, held to a lower pleading standard than one who seeks to temporarily enjoin another party. Specifically, a plaintiff seeking to avoid dismissal under Rule 12 (b)(6) does not have to present facts from which the Court can conclude the plaintiff is likely to prevail on the merits of its claim, as does a movant seeking a temporary restraining order. See <u>Brooks v. Ross</u>, 578 F.3d 574 (June 4, 2009, 7th Cir.) (applying <u>Iqbal</u>). Thus, Eco Tec's reliance on the <u>Motorola</u> court's decision concerning the proper standard to be applied on a motion to dismiss to an ITSA complaint has no force here, because there is no motion pending against Eco Tec's ITSA complaint under Fed. R. Civ. P. 12(b)(6), and the <u>Motorola</u> decision, even if it remains good law post-<u>Iqbal</u>, has no application to a motion for temporary restraining order. Thus, this argument fails.

In sum, Plaintiff's Complaint fails to allege facts establishing that it is likely to prevail on the merits of its ITSA claim against Smart Sealed, and the arguments raised in Plaintiff's Motion and supporting memorandum of law likewise fail to establish that Eco Tec is likely to prevail on the merits of any claim under the ITSA against Smart Sealed. For these reasons, Plaintiff's Motion for Temporary Restraining Order against Smart Sealed under the ITSA should be denied.

### E. The Allegations Regarding Tortious Interference With Contract Do Not Warrant Injunctive Relief

The Complaint seeks redress under its tortious interference claim based on the allegations that: (1) Eco Tec has an enforceable agreement (it does not); and (2) Smart Sealed acted without a justifiable reason to hire Decker (it has justification).

1.     **Smart Sealed Acted with Justification**

Eco Tec conceded in its Complaint that Smart Sealed sent an offer letter to hire Decker as a salesperson. Eco Tec has alleged no specific facts to support a claim that Smart Sealed's reasons were not justifiable. Thus, the Motion for a Temporary Restraining Order should be denied on this basis as well.

2.     **The Agreement is not Enforceable Based on Applicable Legal Principles Addressing Restraints on Competition**

The enforceability of a restrictive covenant in an employment contract depends on whether the restraints imposed are reasonably necessary for the protection of an employer's business from unfair or improper competition. Reinhardt Printing Co. v. Feld, 142 Ill. App. 3d 9 (1st Dist. 1986). The question of whether a restrictive covenant is enforceable or not is a question of law. Lawrence & Allen v. Cambridge Human Res. Group, Inc., 292 Ill. App. 3d 131, 137 (2nd Dist. 1997). Because such covenants operate as partial restraints of trade, they are scrutinized carefully and therefore Illinois courts require that an employer establish the existence of a protectable interest to justify a particular restrictive covenant. Reinhardt Printing Co. v. Feld, 142 Ill. App. 3d at 15.

There are two general situations in which a "protectable interest" may be found to exist. One of which is where, by the nature of the employer's business, it has a near-permanent relationship with its customers and, but for this association with the employer, the employee would not have had contact with the customers. The second "protectable interest" can be found where the former employee learns of trade secrets or acquires other confidential information during his employment and subsequently attempts to use it for his own benefit. Arpac Corp. v. Murray, 226 Ill. App. 3d 65, 73 (1st Dist. 1992).

It is axiomatic that Illinois courts look to the following factors in determining whether an employer's relationship with its customers is "near permanent" in nature:

- the length of time required to develop the customers/clients;

- the amount of money invested to acquire customers/clients;

- the degree of difficulty in acquiring customers/clients;

- the extent of personal customer contact by the employee;

- the extent of the employer's knowledge of its customers/clients;

- the duration of the customers'/clients' association with the employer; and

- the continuity of the employer-customer/client relationship.

Audio Properties Inc. v. Kovach, 275 Ill. App. 3d 145, 655 N.E. 2d 1034 (1st Dist. 1995).

Employers often attempt to impose a broad non-competition covenant which would purport to bar an individual from working in an entire industry. Such a non-competition covenant goes beyond protecting any former employer's legitimate business interests – because by definition it limits competition generally – and is therefore subject to a higher degree of scrutiny than, for example, a non-solicitation covenant which typically is limited to restricting specific activity in the form of soliciting particular clients. See: Abbott-Interfast Corp. v. Harkabus, U.S. 250 Ill. App. 3d 13, 18 (2nd Dist. 1993). A non-competition portion is rendered superfluous in that an employer's legitimate interests (if it has one) can be adequately protected by a narrowly tailored non-solicitation or "activity" covenant. To illustrate this point, the court in Arpac Corp. v. Murray stated: "the non-competition portion of the agreement...does not serve to protect Arpac's interest in its customers, but rather, exists only to stifle any competition Murray might offer to Arpac. As such, the non-competition portion of the agreement is unjust and void as against public policy." Arpac, 226 Ill. App. 3d at 79.

However, overbroad non-solicitation covenants are equally void. In <u>Grand Vehicle Works Holdings Corp. v. Frey</u>, 2005 U.S. Dist. LEXIS 13629 (N.D. Ill., July 8, 2005) (copy attached hereto as Ex. A, along with other LEXIS cases cited herein), the Northern District of Illinois, interpreting a restrictive covenant under Illinois law, held that a non-solicitation covenant, not limited to the employer's specific protectable interest, was held to be unenforceable as drafted. The Court held that where an employer has a legitimate business interest in barring certain activity, a restrictive covenant will be unenforceable ***on its face*** if it unreasonably bars more than that protected interest. (<u>Id</u>.) (emphasis supplied)

Illinois courts have consistently struck down not only inherently overbroad non-competition provisions, they have also determined that over-reaching customer non-solicitation provisions, purportedly limiting contact with an employer's entire customer base, are simply unenforceable. In <u>Eichman v. Nat'l Hospital & Healthcare</u>, 308 Ill. App. 3d 337 (1st Dist. 1999), the court entered judgment in favor of the former employee finding that the non-solicitation covenant was overly broad in that, if implemented, it would insulate the former employer from competition as to its existing and future customers regardless of whether the plaintiff had ever dealt with such customers. As such, the restriction was construed as an impermissible attempt on the part of the employer to prevent competition ***per se*** 308 Ill. App. 3d at 348.

In a case with a similar restriction to that of Eco Tec in this case, the court in <u>Lawrence & Allen</u> struck down a covenant which would have purportedly precluded the former employee from "directly or indirectly competing with [the employer]…for two years after his voluntary termination of employment…." (292 Ill. App. 3d at 134). The <u>Lawrence & Allen</u> court construed the subject provision as one, if implemented, which would bar virtually all competition by the former employee in any capacity. (<u>Id</u>. at 141).

22

Such non-competition provisions, barring an individual from working in any capacity in an industry, have been construed to be "patently unfair." Arpac Corp. v. Murray, 226 Ill. App. 3d at 79. It should also be noted that the fairness and the reasonableness of a restrictive covenant is distinct from, and in addition to, the employer's burden to establish that it also has a "protectable interest" to justify the covenant. Eichman v. Nat'l Hospital & Healthcare, 308 Ill. App. 3d at 344. As the court held in Eichman, even assuming the existence of a protectable interest, the court can still decide as a matter of law if the covenant is greater than necessary. Id. See also Lawrence & Allen, 292 Ill. App. 3d at 141 (covenant not to compete, as well as covenant not to solicit all of the company's customers, are both overly broad and unreasonable as a matter of law); and Lee/O'Keefe Insurance Agency v. Ferega, 163 Ill. App. 3d 997, 1005 (4th Dist. 1987) (court affirmed the trial court's determination that the restrictive covenant – barring the employee from directly or indirectly owning, managing or operating any business that solicited the type of business as the employee's former employer – was overbroad, unreasonable and unenforceable given that the covenant as drafted would effectively prohibit the former employee from engaging in his occupation and would prohibit him from earning a livelihood).

There can be no question that the restrictive covenant in Decker's employment agreement is facially invalid as its express purpose it to impermissibly insulate Eco Tec from competition and/or to prevent Decker from earning a living. In addition, as the Complaint effectively concedes, Eco Tec does not have a "near- permanent" customer base, given its customers are predominantly, if not exclusively, one time end users, it does not have a recognized protected interest justifying its purported restraint on competition as a whole.

**F.     The Provision As Drafted Cannot Be Modified or "Blue-Penciled" To Create A Less Restrictive Covenant**

Smart Sealed anticipates that Eco Tec cannot legitimately defend what is clearly an overbroad, unjust and unreasonable covenant. Rather, Eco Tec will likely claim that its covenant was intended to and/or should be interpreted as being limited to competition in the form of preventing Decker from soliciting its customers. However, in cases where an employer has chosen to draft the more onerous, one sided, anticompetitive non-competition covenant, principles of fairness dictate that no such modification should be considered by the trial court. This remains the case even where a restrictive covenant agreement contains a "severability clause" which would purportedly delegate to the court the authority to modify any void or unreasonable provision. As noted below, such severability clauses do not save an otherwise void and unreasonable provision where employers such as Eco Tec have chosen to exclude any less restrictive post-employment covenants within its agreement.

As the court stated in Arpac v. Murray:

> Although a circuit court is not prohibited from modifying restraints embodied in an employment contract, the fairness of the restraint initially imposed is a relevant consideration of the court in equity. (citations omitted)

226 Ill. App. 3d at 80. In Lee/O'Keefe Insurance Agency, the employer in that case claimed that the terms of the broad non-competition covenant, despite its language to the contrary, would not prohibit the employee from being employed by a competitive business, but would only prohibit the employee from soliciting its customers. The court in O'Keefe rejected this interpretation given the plain reading of the non-competition covenant. The trial court in Lee/O'Keefe Insurance Agency refused to modify the terms of the covenant as drafted by the former employer. On appeal, the appellate court affirmed the trial court's decision stating: "A modification of the contract under the circumstances here would have involved more than a

24

temporal or geographic modification and would have been tantamount to drafting a new contract. Moreover, it could have a potential effect of discouraging the narrow and precise draftsmanship which should be reflected in written agreements." 163 Ill. App. 3d at 1007.

The court in <u>Lawrence & Allen</u> similarly refused to modify two restrictive covenants where both were overly broad, as drafted by the former employer, and where those provisions were unreasonable. 292 Ill. App. 3d at 141.

The court in <u>Eichman v. Nat'l Hospital and Healthcare</u> followed these same principles where it refused to modify an unreasonable restrictive covenant, not just because it was unreasonable, but where the degree of unreasonableness rendered it unfair. The court noted in <u>Eichman</u> that "drastic modifications, rather than minor ones, would be necessary and that would be tantamount to fashioning a new agreement." 308 Ill. App. 3d at 348. The court in <u>Abbott-Interfast Corp. v. Harkabus</u>, followed the same line of reasoning and determined that the unenforceability of one provision in a contract would render the entire contract void, even though the contract contained a severability clause. 250 Ill. App. 3d at 21.

In addition, to the extent that Eco Tec claims that its protectable interest is in its "confidential information," it is virtually inconceivable that a non-competition covenant, the broadest of all restrictive covenants, is anything other than an excessive restraint when compared to the need to protect any claimed business interest of Eco Tec.

It is important to note that the severability clause contained in the agreement drafted by Eco Tec (par. 14.1) does not provide that the Court should adjust ***unreasonable*** terms to make them ***reasonable***. The severability clause, as drafted by Eco Tec, has the "potential effect of discouraging the narrow and precise draftsmanship, which should be reflected in written agreements." <u>Eichmann v. Nat'l Hospital & Healthcare Services, Inc.</u>, 308 Ill. App. 3d at 347-

48. This Court should, similar to the court in <u>Grand Vehicle Holdings</u>, decline any attempt by Eco Tec to delegate to this Court what it should have done in the first place.[4]

### III.  <u>CONCLUSION</u>

WHEREFORE, for the above stated reasons, Defendant Smart Sealed Insulation, LLC requests that Plaintiff's Motion for Temporary Restraining Order be denied.

Dated: April 26, 2010                                SMART SEALED INSULATION, LLC


By: ___/s/James J. Convery_____
                                 One of Their Attorneys

James J. Convery
Thomas S. Bradley
Andrew S. Goldberg
Laner, Muchin, Dombrow, Becker,
  Levin and Tominberg, Ltd.
515 North State Street, Suite 2800
Chicago, Illinois 60654
(312) 467-9800
(312) 467-9479 (fax)

---

[4]  In declining to modify the agreement, the court relied on several other decisions interpreting Illinois law.  See <u>Pactiv Corp. v. Menasha Corp.</u>, 261 F. Sup. 2d 10099, 1016-17 (N.D. Ill. 2003); <u>Roberg v. Qualitek Int'l Inc.</u>, 2002 U.S. Dist. LEXIS 1217, 2002 WL 109360, at *7 (N.D. Ill. January 25, 2002); <u>Nobel Biocare USA v. Lynch</u>, 1999 U.S. Dist. LEXIS 23252, 1999 WL 958501, at *2 (N.D. Ill. Sept. 16, 1999); <u>Trailer Leasing Co. v. Associates Commer. Corp.</u>, 1996 U.S. Dist. LEXIS 9654, 1996 WL 392135, at *4 (N.D. Ill. July 10, 1996).

## **CERTIFICATE OF SERVICE**

I, James, an attorney, hereby certify that on April 26, 2010, I caused to be served a copy of the foregoing **Defendant Smart Sealed Insulation, LLC's Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order**, in the above-captioned matter to be filed with the Clerk of the District Court and served on the parties of record, including those listed below, by operation of the Court's CM/ECF electronic filing system, addressed to:

> Steven P. Mandell
> Steven L. Baron
> John D. Fitzpatrick
> Mandell Menkes LLC
> 333 West Wacker Drive
> Suite 300
> Chicago, IL 60606
> smandell@mandellmenkes.com
> sbaron@mandellmenkes.com
> jfitzpatrick@mandellmenkes.com
>
> Steven B. Borkan
> Borkan & Schall Ltd.
> Two First national Plaza
> 20 South Clark Street
> Suite 1700
> Chicago, IL 60603
> sborkan@borkanscahill.com

> /s/James J. Convery
> James J. Convery

# EXHIBIT A



LEXSEE 2005 US DIST LEXIS 13629

**GRAND VEHICLE WORKS HOLDINGS CORPORATION, Plaintiff, v. THOMAS FREY and RICHARD FISH, Defendants.**

No. 03 C 7948

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2005 U.S. Dist. LEXIS 13629*

July 8, 2005, Decided
July 8, 2005, Filed

**PRIOR HISTORY:** *Grand Vehicle Works Holdings Corp. v. Frey, 2005 U.S. Dist. LEXIS 9509 (N.D. Ill., May 11, 2005)*

**COUNSEL: [*1]** For Grand Vehicle Works Holdings Corporation, Plaintiff: Hal J. Wood, James H. Ryan, Karen Lynn Black, Michael Howard Israel, Horwood, Marcus & Berk, Chicago, IL.

For Thomas Frey, Richard Fish, Defendants: Kenneth T. Lopatka, Laurence John Oleksa, Perkins Coie LLC, Chicago, IL.

**JUDGES:** AMY J. ST. EVE, District Court Judge.

**OPINION BY:** AMY J. ST. EVE

**OPINION**

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Plaintiff Grand Vehicle Works Holdings Corporation ("GVW") sued Defendants Thomas Frey ("Frey") and Richard Fish ("Fish"), (collectively "Defendants"), for breach of contract, tortious interference with a contractual relationship, breach of fiduciary duty, and unfair competition. Defendants move pursuant to *Rule 12(c)* for judgment on the pleadings on GVW's breach of contract, breach of fiduciary duty, and unfair competition claims because the non-solicitation provision at issue is unenforceable. For the reasons discussed below, the Court grants Defendants' motion.

**BACKGROUND** [1]

1  The Court provided a discussion of the factual background of this case in its Opinion on summary judgment. *Grand Vehicle Works Holdings Corp. v. Frey, 2005 U.S. Dist. LEXIS 9509, No. 03 C 7948, 2005 WL 1139312 (N.D. Ill. May 11, 2005)*.

**[*2]** On May 11, 2005, the Court granted partial summary judgment for Defendants on the basis that the non-competition agreement in Defendants' Agreements [2] was unenforceable under Illinois law. The Court denied summary judgment on the breach of contract claim related to the non-solicitation provision of Defendants' Agreements because material questions of fact existed whether Defendants had recruited or solicited GVW employees in breach of that provision. The Court did not address the issue of the enforceability of the non-solicitation provision because Defendants did not properly raise that issue. Because genuine questions of

2005 U.S. Dist. LEXIS 13629, *2

fact existed whether Defendants breached the non-solicitation provision, the Court also denied summary judgment on GVW's breach of fiduciary duty, tortious interference, [3] and unfair competition claims. On June 8, 2005, Defendants moved to modify the scheduling order to permit them leave to file their Motion for Judgment on the Pleadings pursuant to *Rule 12(c)*. The Court granted Defendants' motion for leave and set a briefing schedule. [4]

2 Defendants' Agreements are attached as Exhibits A - C to GVW's Complaint and consist of the Confidentiality and Non-compete Agreements that GVW's subsidiary, Workhorse, presented to Frey and Fish in connection with a stock option grant and a Confidentiality and Non-compete Agreement entered into by Fish with Workhorse in Spring 2002. (R. 91-1; Ct.'s Memorandum Opinion and Order of May 11, 2005 at 5-6.)

[*3]

3 Based on the Court's ruling that the non-competition clause in Defendants' Agreements was unenforceable, GVW has abandoned its tortious interference with a contractual relationship claim, although it has reserved the right to renew that claim if for any reason its breach of the non-competition provision claim is revived.

4 In granting Defendants' motion for leave and setting a briefing schedule, the Court specifically directed GVW's attention to the issue of "what additional evidence, if any, it has beyond that presented to the Court in response to Defendants' summary judgment motion, regarding the issue of whether Defendants used any of Plaintiff's confidential information." (R. 118-1; Ct.'s June 10, 2005 Minute Order.)

## ANALYSIS

### I. Legal Standard

On a motion for judgment on the pleadings pursuant to *Federal Rule of Civil Procedure 12(c)*, a court ordinarily applies the same standard that applies to a *Rule 12(b)(6)* motion to dismiss. *North Indiana Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 452 (7th Cir. 1998)* [*4] (citing *Frey v. Bank One, 91 F.3d 45, 46 (7th Cir. 1996)*). Therefore, a court must grant a *Rule 12(c)* motion only if "it appears beyond

doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Thomason v. Nachtrieb, 888 F.2d 1202, 1204 (7th Cir. 1989)*.

### II. The Pleadings Before The Court

GVW attached Defendants' Agreements to its Complaint and therefore those agreements are part of the pleadings. *See North Indiana Gun & Outdoor Shows, 163 F.3d at 452-53* (holding that the pleadings include "written instruments attached [to the complaint] as exhibits, such as [] contracts"). (R. 1-1; Compl., Exs. A, B, and C.) The Court may also rely on its Summary Judgment Opinion in deciding Defendants' *Rule 12(c)* Motion. *See U.S. v. Wood, 925 F.2d 1580, 1582 (7th Cir. 1991)* (holding that a district court "may also take judicial notice of matters of public record" without converting the motion into one for summary judgment); *also see Henson v. CSC Credit Servs., 29 F.3d 280, 284 (7th Cir. 1994)*.

### III. Whether The Non-Solicitation Provisions Are Enforceable

#### [*5] A. Illinois Law On Restrictive Covenants

Illinois courts disfavor and closely scrutinize restrictive covenants because they are "repugnant to the public policy encouraging an open and competitive marketplace." *Roberge v. Qualitek Int'l, Inc., 2002 U.S. Dist. LEXIS 1217, No. 01-C-5509, 2002 WL 109360, at *4 (N.D. Ill. Jan. 28, 2002)* (citing *Bishop v. Lakeland Animal Hosp., 268 Ill.App.3d 114, 644 N.E.2d 33, 36, 205 Ill. Dec. 817 (Ill.App.Ct. 1994))*. Under Illinois law, a covenant not to recruit is enforceable to the extent that it supports the employer's legitimate business interest in guarding its confidential information [5] from potential competitors. *YCA, LLC v. Berry, 2004 U.S. Dist. LEXIS 8129, No. 03 C 3116, 2004 WL 1093385, *17 (N.D. Ill. May 7, 2004)*; *also see Springfield Rare Coin Galleries, Inc. v. Mileham, 250 Ill.App.3d 922, 189 Ill.Dec. 511, 620 N.E.2d 479 (Ill.App.Ct. 1993)* (requiring that a plaintiff prove that the defendant tried to use the plaintiff's confidential information for his own benefit in order for a court to find a restrictive covenant narrowly tailored to protecting the plaintiff's confidential information). Restrictive covenants should be narrowly tailored [*6] so as to protect the protectable interest of the employer. *Outsource Int'l, Inc. v. Barton, 192 F.3d 662, 669 (7th Cir. 1999)*; *Lawrence and Allen, Inc. v. Cambridge Human Resource Group, Inc., 292 Ill.App.3d 131, 138, 685 N.E.2d 434, 441, 226 Ill.Dec. 331*

*(Ill.App.Ct. 1997)*. Even if an employer has a legitimate business interest in barring some recruiting activity, a restrictive covenant will be unenforceable on its face if it unreasonably bars more than that activity. *See YCA, 2004 U.S. Dist. LEXIS 8129, 2004 WL 1093385, *18*; *Pactiv Corp. v. Menasha Corp., 261 F.Supp.2d 1009, 1014-15 (N.D. Ill. 2003)*.

> 5 GVW does not assert any other protectable business interest related to its non-solicitation provision other than the protection of its confidential information.

## B. Whether The Non-Solicitation Provision Is Narrowly Tailored To Protect GVW's Protectable Business Interest

In defending the enforceability of the non-solicitation provision, GVW merely argues that such [*7] a provision, "on the facts of this case, [is] fully enforceable," citing to *YCA, LLC v. Berry, 2004 U.S. Dist. LEXIS 8129, No. 03 C 3116, 2004 WL 1093385 (N.D. Ill. May 7, 2004)*. In *YCA*, the court held that "Illinois law declares a covenant not to recruit enforceable, to the extent that it supports the employer's legitimate business interest in guarding his confidential information from potential competitors." *YCA, 2004 U.S. Dist. LEXIS 8129, 2004 WL 1093385, *17*. The *YCA* court then analyzed the non-recruitment provision and found that it was not narrowly tailored to protect only the employer's legitimate business interest because the provision was neither limited to only barring recruitment of associates who might possess any confidential information nor barring recruitment on behalf of a YCA competitor. *2004 U.S. Dist. LEXIS 8129, [WL] at *18*.

Similar to the *YCA* non-recruitment provision, the non-solicitation provision here also lacks these two limitations. The non-solicitation provision of Defendants' Agreements provides:

> During the Term of Non-Competition, Employee will not, and will not permit any of his affiliates to, directly or indirectly, recruit or otherwise solicit or induce any employee, customer, [*8] subscriber or supplier of the Company to terminate its employment or arrangement with the Company, otherwise change its relationship with the Company or establish any relationship with the Employee or any

of his affiliates for any business purpose deemed competitive with the business of the Company.

(R. 1-1; Compl. Exs. A, B, and C.) First, the provision bars recruitment or solicitation of "any employee, customer, subscriber, or supplier of the Company" and is not limited to only such employees that may have confidential information. Second, the provision bars recruitment on behalf of any company, whether or not that company competes with GVW. Defendants contend that the language "for any business purpose deemed competitive with the business of the Company" in the non-solicitation provision limits only the prohibition against "establishing any relationship with the Employee or any of his affiliates" rather than modifying each prohibition contained in the non-solicitation provision. In other words, Defendants contend that the non-solicitation provision purports to bar Defendants from recruiting for any purpose and is not limited to a "business purpose deemed competitive with [*9] the business of [Workhorse]." The Court agrees with Defendants and GVW tacitly consents to this construction because it does not address this issue. As Defendants note, this interpretation is grammatically correct because there is no comma separating the "for any business purpose deemed competitive" clause from the preceding phrases in the series. *See Elliot Coal Mining Co., Inc. v. Director, Office of Workers' Compensation Progs., 17 F.3d 616, 630 (3rd Cir. 1994)* ("use of a comma to set off a modifying phrase from other clauses indicates that the qualifying language is to be applied to all of the previous phrases and not merely the immediately preceding phrase"). Properly construed, the provision bars recruiting on behalf of any company, regardless of the nature of that company's business, and is overbroad. The Court finds the reasoning of *YCA* persuasive to the extent it holds unenforceable a non-solicitation provision that is not limited to protecting the employer's confidential information from a competitor. Applying that reasoning here, the non-solicitation provision in Defendants' Agreements is unenforceable on its face.

**[*10]**

GVW's primary argument is the Court should follow the lead of the *YCA* court and rewrite the non-solicitation provision to render it enforceable. In *YCA*, the court found that although the restrictive covenant was unreasonable on its face, it was reasonable as applied to

the defendant's conduct. *YCA, 2004 U.S. Dist. LEXIS 8129, 2004 WL 1093385, *18.* The court relied on a provision in the contract providing that "in the event a court should determine not to enforce a covenant as written due to overbreadth, you specifically agree that said covenant shall be enforced to the extent reasonable, whether said revision be in time, territory, or scope of prohibited activities." *Id.* The court further found that such a revision was "easy to accomplish" and that the individuals recruited by the defendant "likely had access to [confidential information], which they could use to benefit [their new employer]." *2004 U.S. Dist. LEXIS 8129, [WL] at *19.*

The Court declines to rewrite the non-solicitation provision in Defendants' Agreements. Unlike the contract in *YCA* that the court found "required" it to attempt to reform the covenant, *YCA, 2004 U.S. Dist. LEXIS 8129, 2004 WL 1093385,* **[*11]** *18,* here Defendants' agreements merely grant the Court the "power to reduce the duration or scope of such provision and to enforce such provision as so reduced." (R. 1-1; Compl. Exs. A and B, P 6, Ex. C, P 7.) The modification provision at issue in *YCA* reflected an express agreement between the parties to the contract that the non-recruitment provision would be modified to preserve its enforceability. *YCA, 2004 U.S. Dist. LEXIS 8129, 2004 WL 1093385, *18.* Therefore, the plain language of the agreement made clear that the parties intended a court to enforce the non-recruitment provision to the extent the provision could reasonably apply to the facts of the case. Here, the plain language of the modification provision in paragraph 6 of Defendants' Agreements, at most, indicates that the parties intended the Court to use its discretion in determining whether or not to modify the restrictive covenants. *See Thomas v. Pearle Vision, Inc., 251 F.3d 1132, 1138 (7th Cir. 2001)* (recognizing that a party's intent is best determined from the plain language of the contract and recognizing the distinction between mandatory and permissive language in ascertaining the parties' intent). The **[*12]** language, however, provides no guidance as to when the parties intended a court to modify the scope. Without express guidance as to the parties' intention, the Court will not modify their agreement.

Also, unlike in *YCA* where the Court found that the employees recruited by the defendant could use the plaintiff's confidential information at their new employer, here, the Court has already found that Defendants never

tried to use GVW's confidential information to their own benefit. (R. 91-1; Ct.'s Memorandum Opinion and Order of May 11, 2005 at 12-13.) [6] Accordingly, there is no reasonable construction of the non-solicitation provision that still covers Defendants' conduct here. [7] *See Lawrence and Allen, 292 Ill.App.3d 131, 143-44, 685 N.E.2d 434, 226 Ill. Dec. 331* (finding restrictive covenant unenforceable as applied to defendant's conduct because "beyond bald conclusions, plaintiff failed to offer any evidence that [defendant] actually tried to use any confidential information for his own benefit"); *See Springfield Rare Coin Galleries, Inc. v. Mileham, 250 Ill.App.3d 922, 189 Ill.Dec. 511, 620 N.E.2d 479 (Ill.App.Ct. 1993)* (holding that in order for a restrictive covenant to **[*13]** be narrowly tailored to protecting a plaintiff's legitimate July 8, 2005 business interest in confidential information the plaintiff must show that the defendant used the confidential information to his or her benefit).

6    Recognizing that GVW could potentially present evidence at trial beyond that which it presented at the summary judgment stage, the Court specifically requested GVW to address whether it had any such additional evidence regarding Defendants' use of GVW's confidential information. (R. 118-1; Ct.'s June 10, 2005 Minute Order.) GVW did not provide any such additional evidence in responding to Defendants' *Rule 12(c)* motion.

7    Further, unlike in *YCA,* the reformation of the non-solicitation provision here would not be "easy." The Court would have to restrict both the scope of employees that the provision barred Defendants from recruiting and the scope of companies that the provision barred Defendants from recruiting on behalf of.

Additionally, the Court agrees with courts applying Illinois **[*14]** law that have declined to modify restrictive covenants. *See Pactiv Corp. v. Menasha Corp., 261 F.Supp.2d 1009, 1016-17 (N.D. Ill. 2003); Roberge, 2002 U.S. Dist. LEXIS 1217, 2002 WL 109360, at *7; Nobel Biocare USA v. Lynch, 1999 U.S. Dist. LEXIS 23252, 1999 WL 958501, at *2 (N.D. Ill. Sept. 15, 1999); Trailer Leasing Co. v. Associates Commer. Corp., 1996 U.S. Dist. LEXIS 9654, 1996 WL 392135, at *4 (N.D. Ill. July 10, 1996).* [8] The reasoning of Judge Holderman in *Pactiv Corp., 261 F.Supp.2d at 1016-17,* is particularly persuasive. The court in *Pactiv* noted that "modification

could have the potential effect of discouraging the narrow and precise draftsmanship, which should be reflected in written agreements." *Id.* (citing *Eichmann v. National Hospital and Health Care Servs. Inc.,* 308 Ill.App.3d 337, 347-48, 241 Ill.Dec. 738, 719 N.E.2d 1141 (Ill.App.Ct. 1999)). Judge Holderman also relied on the fact that if the court found the entire provision at issue to be unenforceble the agreement would still contain other enforceable provisions. *Pactiv, 261 F.Supp.2d at 1016.* As in *Pactiv,* here the Defendants' Agreements contain a provision **[*15]** expressly related to confidential information, (R. 1-1; Compl, Exs. A, B, and C at P 4), that will remain part of the agreements even if the non-solicitation provision in paragraph 3 is unenforceable in its entirety. [9] Accordingly, the Court declines to modify the non-solicitation provisions in Defendants' Agreements. [10]

> 8   In arguing that the Court should modify the non-solicitation provision here, GVW only cites to one case, *YCA,* which as discussed above the Court finds distinguishable on the issue of modifying the provision.
> 9   As with the contract in *Pactiv,* Defendants' Agreements have a severability clause. (R. 1-1; Compl., Exs. A and B, P 6, Ex. C, p 7.)
> 10   Defendants also filed a motion *in limine* seeking to bar evidence of any breach of the non-solicitation provision because that provision was unenforceable under Illinois law. The Court notes that for the reasons discussed in this Opinion, the Court would have granted Defendants' motion *in limine.*

**[*16]**

Defendants contend that if the Court finds that the non-solicitation provision in Defendants' Agreements is unenforceable, then the Court should also enter judgment against GVW on its breach of fiduciary duty and unfair competition claims, citing *Composite Marine Propellers,*

*Inc. v. Van Der Woude, 962 F.2d 1263, 1265 (7th Cir. 1992)* ("claims based on unfair competition and breach of fiduciary duty stand or fall with those based on breach of contract"). GVW does not address this argument in its response and therefore waives any argument that the Court should not enter judgment on its unfair competition and breach of fiduciary duty claims. *Blise v. Antaramian, 409 F.3d 861, 866, n.3 (7th Cir. 2005).* Even absent this waiver, judgment on the pleadings against GVW on its breach of fiduciary duty and unfair competition claim is appropriate. As the Seventh Circuit held in *Composite Marine Propellers,* when there is no basis for a fiduciary duty other than the contract, the breach of fiduciary duty claim fails when the breach of contract claim fails. Regarding unfair competition, the court held that "Illinois allows **[*17]** competition between a departing employee and his former employer in the absence of a contractual promise to refrain from such competition." *Composite Marine Propellers, 962 F.2d at 1265.* Therefore, because the Court finds the non-solicitation provision in Defendants' Agreements unenforceable, GVW's claim for unfair competition fails. Accordingly, the Court enters judgment for Defendants on GVW's unfair competition and breach of fiduciary duty claims.

**CONCLUSION**

The Court grants Defendants' motion pursuant to *Rule 12(c)* and enters judgment against GVW on all of its remaining claims because the non-solicitation provision in Paragraph 3 of Defendants' Agreements is unenforceable under Illinois law.

Dated: July 8, 2005

ENTERED:

AMY J. ST. EVE

United States District Court Judge



LEXSEE 2001 U.S. DIST. LEXIS 2301

**ELIZABETH KINNEY, REGIONAL DIRECTOR OF REGION 13 OF THE NATIONAL LABOR RELATIONS BOARD, FOR AND ON BEHALF OF THE NATIONAL LABOR RELATIONS BOARD, Plaintiffs, v. FEDERAL SECURITY, INC., AND ITS ALTER EGOS OR AGENTS, JAMES R. SKRYZPEK AND JANICE M. SKRYZPEK, INDIVIDUALS, Defendants.**

No. 01 C 0838

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2001 U.S. Dist. LEXIS 2301; 166 L.R.R.M. 2892; 142 Lab. Cas. (CCH) P10,935*

March 2, 2001, Decided
March 6, 2001, Docketed

**DISPOSITION:** [*1] Petitioner's motion for temporary restraining order denied.

**COUNSEL:** For ELIZABETH KINNEY: Denise Rene Jackson, National Labor Relations Board, Chicago, IL.

For FEDERAL SECURITY, INC.: Douglas Alan Darch, Richard Burk Lapp, Alissa Brit Lipson, Seyfarth Shaw, Chicago, IL.

For FEDERAL SECURITY, INC.: Scott Murray Levin, Levin, McParland, Phillips & Minetz, LLC, Chicago, IL.

**JUDGES:** Suzanne B. Conlon, United States District Judge.

**OPINION BY:** Suzanne B. Conlon

**OPINION**

**MEMORANDUM OPINION AND ORDER**

**BACKGROUND**

This action was filed by the National Labor Relations Board ("NLRB") for a temporary injunction to restrain Federal Security, Inc., James R. Skrzypek and Janice M. Skrzypek ("respondents") from prosecuting an ongoing case in an Illinois court against former employees. *Skrzypek, et al. v. Brewer, et al.*, Case No. 00 L 06317 (Circuit Court of Cook County)("the state case"). [1] In that case, respondents seek $ 140,000 in attorneys' fees and court costs from 17 former employees, who allegedly conspired to give false testimony against Federal Security in a purportedly baseless NLRB unfair labor charge they filed eight years ago in retaliation for termination of their employment. [*2] Respondents claim the discharged employees' conduct constitutes malicious prosecution and abuse of process under Illinois law.

> 1 The Skrzypeks brought the state case as successors-in-interest of Federal Security, a dissolved corporation.

The state case was filed on June 2, 2000; it triggered a second NLRB charge by the discharged employees on June 30, 2000. The second NLRB charge contends that the state case is an unfair labor practice to punish the discharged employees for their participation in the original NLRB charge. The NLRB apparently took no

Case: 1:10-cv-02478 Document #: 40 Filed: 04/29/10 Page 40 of 59 PageID #:399

Page 2

2001 U.S. Dist. LEXIS 2301, *2; 166 L.R.R.M. 2892;
142 Lab. Cas. (CCH) P10,935

action on the second charge until January 29, 2001, when it issued a complaint and notice of hearing. The NLRB hearing is scheduled on March 13, 2001.

Meanwhile, the state court issued a default order against 11 of the former employees in October 2000. Several weeks later, two defaults were vacated on the unopposed motion of those two former employees. Nine defaulted former employees remain; they apparently have taken no action to remedy the defaults entered more [*3] than four months ago. Respondents have now moved for a prove-up hearing to reduce the defaults to judgment. This court has not been advised of the prove-up hearing date. However, a hearing on a fully briefed motion to dismiss filed by seven former employees who have appeared in the state case is set on March 6, 2001.

After respondents filed their prove-up motion, the NLRB moved for a temporary restraining order ("TRO") to bar respondents from (1) attempting to enforce or collect on any default judgments obtained in the state case; and (2) "interfering with or coercing" former employees from exercising their right to file NLRB charges or to give testimony in NLRB proceedings. *See* NLRB's proposed Order Granting Temporary Restraining Order. The NLRB requests that the TRO remain in effect until it resolves the unfair labor practices charge arising from the state case. In support of the motion, the NLRB submits only a copy of respondents' motion for default judgment in the state case and this court's scheduling order, and has chosen to rest on the "documentary history" of its litigation against Federal Security. [2] No affidavits from the defaulted former employees were submitted, nor [*4] were any witnesses called to testify at the hearing on the NLRB's TRO motion. The NLRB simply asserted during argument and in its brief that a temporary restraining order is required because the defaulted employees will otherwise suffer irreparable harm. That harm is characterized as financial ruin and injury to reputation. In addition, the NLRB contends that its own administrative processes and credibility with aggrieved employees will be irreparably injured if a TRO is not issued.

2   The affidavit of the NLRB's Regional Director (and nominal petitioner) Elizabeth Kinney was submitted with the initial petition for a temporary injunction. Kinney's factual assertions are based on "information and belief," and not on her personal knowledge. Thus, the court finds the

Kinney affidavit lacks probative value on the TRO issues.

## DISCUSSION

### A. Section 10(j) injunctive relief

For purposes of resolving the motion for a TRO, the court assumes jurisdiction under Section 10(j) of the National Labor Relations [*5] Act, *29 U.S.C. § 160(j)*. [3] Section 10(j) authorizes the court to grant injunctive relief pending the NLRB's resolution of the former employees' pending unfair labor practices charge. This interim remedy prevents potential frustration or nullification of the NLRB's remedial authority caused by delays inherent in NLRB administrative proceedings. *Kinney v. Pioneer Press, 881 F.2d 485, 493-94 (7th Cir. 1989)*. The burden is on the NLRB to establish that the extraordinary remedy of injunctive relief is just and proper in a particular case. *29 U.S.C. § 160(j)*. Traditional equitable standards are applied to determine whether the just and proper standard has been satisfied. *NLRB v. Electro-Voice, Inc., 83 F.3d 1559, 1566-67 (7th Cir. 1998)*. Accordingly, the NLRB must show by a preponderance of the evidence (1) some likelihood of success on the merits; (2) that there is no adequate remedy at law and irreparable harm will result if the injunction is denied; (3) irreparable harm to the NLRB outweighs threatened harm an injunction would inflict on respondents; and (4) the public interest is served by injunctive relief. [*6] *Id*. The likelihood of success and balancing of harms are evaluated on a "sliding scale;" a strong showing under one element may offset a weaker showing under the other. *Id. at 1568*.

3   Respondents challenge this court's jurisdiction. Because the TRO motion lacks a sufficient evidentiary foundation, the court need not reach the jurisdiction issue until that issue is adequately briefed. The court presumes jurisdiction because the NLRB has provisionally shown that the present charge may be grounded on retaliation for protected activity by Federal Security's former employees in filing the original charge eight years ago.

### B. Analysis

#### (1) Likelihood of success on the merits

In determining whether the NLRB is likely to prevail

Case: 1:10-cv-02478 Document #: 40 Filed: 04/29/10 Page 41 of 59 PageID #:400

Page 3

2001 U.S. Dist. LEXIS 2301, *6; 166 L.R.R.M. 2892;
142 Lab. Cas. (CCH) P10,935

in its pending administrative proceedings against respondents for bringing the state case against former employees who previously filed NLRB charges, this court does not resolve the merits of the unfair labor practices claim. Rather, the court's inquiry is [*7] limited to a decision whether there is a better than negligible chance the NLRB will succeed on the merits. To satisfy this burden, the NLRB must produce some evidence to support the unfair labor charge, together with an arguable legal theory. Here, this means that the NLRB must demonstrate (1) the state case has no disputed issue of material fact or no genuine legal issues; and (2) the state case was improperly brought with a retaliatory motive. *Bill Johnson's Rest., Inc. v. NLRB, 461 U.S. 731, 748-49, 76 L. Ed. 2d 277, 103 S. Ct. 2161 (1983).* Respondents should be allowed to proceed with the state case if there is any realistic chance their legal theories might be adopted by the state court. *Id. at 747.*

It must be noted that the NLRB presently moves to restrain only one aspect of the state case: enforcement and collection of any default judgments that respondents obtain. The NLRB does not seek to restrain the state court from determining the merits of the non-defaulting former employees' fully-briefed motion to dismiss the state case. Indeed, were the state court to grant the dismissal motion, the NLRB would have compelling evidence to satisfy its [*8] threshold requirement that the state case presents no genuine legal issue. Dismissal of the state case would likely moot this injunctive action. Conversely, if the state court denies the pending motion to dismiss, respondents would have convincing evidence that their case presents genuine legal or factual issues. Thus, the NLRB's conclusory assertion that there is no good faith basis for the state case is both premature and unsupported.

### (2) Adequate remedy at law and irreparable harm

The NLRB does not challenge the factual basis for the default orders entered more than four months ago. It is uncontested that the defaulted former employees failed to appear (either *pro se* or by counsel) and failed to respond to the complaint; they did not oppose the default motion; *they have taken no action to vacate the default order;* and they have not filed any objection to the motion for a prove-up hearing. Clearly, the defaulted former employees have an adequate remedy at law, as demonstrated by the two former employees who promptly had their defaults vacated by simply filing a

motion with the state court. The remaining defaults are undisputedly the result of the defaulters' own inaction [*9] in failing to pursue their legal rights and remedies in the state case. Injunctive relief is unwarranted if an employee has chosen not to pursue available and adequate legal remedies.

The NLRB argues that without a TRO, the defaulting former employees would be required to expend their "scarce resources" to defend themselves in the state case and to satisfy any judgment that is entered against them. The record is barren as to the financial resources of the former employees and their present employment circumstances. They are entitled to appear *pro se,* they could have asked the state court to set aside the defaults, and they could have opposed the motion for a prove-up hearing. There is no evidentiary basis to conclude that failure to take these basic steps to protect their interests was the result of indigence. Rather, any resulting financial harm appears to be self-inflicted. Nor is the assertion that the defaulting former employees' reputations would be injured based on anything but conjecture.

Similarly speculative is the NLRB's contention that its administrative processes would be jeopardized and aggrieved employees would be discouraged from filing charges if a TRO were denied. [*10] The record is devoid of evidence that any former employee was coerced or intimidated by respondents in order to discourage participation in NLRB proceedings. In sum, no evidence of irreparable harm has been shown.

### (3) Balance of harms

Just as the NLRB has failed to demonstrate that the defaulting former employees would suffer irreparable harm if a TRO is denied, respondents do not show they will be substantially harmed by a TRO that would delay and possibly frustrate their efforts to enforce default judgments. The court finds the balance of harms does not weigh in favor of either side.

### (4) Public interest

The NLRB has failed to demonstrate that restraining respondents from moving forward to enforce their rights under a default order entered four month ago would damage the public interest. There is no evidence that any former employee of Federal Security has been discouraged from filing and prosecuting grievances with

2001 U.S. Dist. LEXIS 2301, *10; 166 L.R.R.M. 2892;
142 Lab. Cas. (CCH) P10,935

the NLRB. Therefore, the public interest is not at stake. *Szabo v. P\*I\* E Nationwide, Inc., 878 F.2d 207, 210 (7th Cir. 1989).*

## CONCLUSION

The motion for a temporary restraining order is not supported by sufficient evidence to **[\*11]** establish that irreparable harm will otherwise result or that the public interest is at stake. Nor has it been established that the state case is baseless and was filed for retaliatory purposes. Accordingly, it is not proper and just on the present record to restrain respondents from pursuing their rights in the state case.

ENTER:

Suzanne B. Conlon

United States District Judge

March 2, 2001



LEXSEE 1999 US DIST LEXIS 23252

**NOBEL BIOCARE USA, INC., a California corporation, Plaintiff, v. SCOTT LYNCH, a resident of Illinois; and ASTRA TECH, INC., a Delaware corporation, Defendants.**

**99 C 5774**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1999 U.S. Dist. LEXIS 23252*

**September 16, 1999, Decided
September 22, 1999, Docketed**

**DISPOSITION:** [*1] Plaintiff's motion for temporary restraining order granted in part. Plaintiff's motion for expedited discovery granted.

**COUNSEL:** For NOBEL BIOCARE USA INC, plaintiff: Sheri J. Engelken, Barry F. Irwin, Kenneth H. Bridges, Michael W. Kazan, Kirkland & Ellis, Chicago, IL.

For NOBEL BIOCARE USA INC, plaintiff: Gabrielle M Wirth, Barbara Miller, Brobeck, Phleger & Harrison, LLP, Irvine, CA.

For SCOTT LYNCH, ASTRA TECH INC, defendants: Terrence Patrick Canade, Kevin Patrick McJessy, Brian Ignatius Hays, Lord, Bissell & Brook, Chicago, IL.

**JUDGES:** George W. Lindberg, United States District Judge.

**OPINION BY:** George W. Lindberg

**OPINION**

MEMORANDUM OPINION AND ORDER

Plaintiff, Nobel Biocare USA, Inc., moves for a temporary restraining order against Scott Lynch, an Illinois resident, and Astra Tech, Inc., a Delaware corporation. For the following reasons, the court grants the motion as to Count I, misappropriation of trade secrets. Plaintiff alleges that Scott Lynch, a former employee, and Astra Tech, Lynch's current employer, are engaging in a pattern of unfair competition to disrupt Nobel's business, misappropriate its trade secrets and other confidential information, and destroy Nobel's near-permanent [*2] customer relations. It claims that Astra Tech has been systematically approaching its top salesmen and inducing them to violate their employment agreements [1] and to disclose Nobel's trade secrets and confidential information once they were employed with Astra Tech. Nobel requests a temporary restraining order prohibiting defendants from using or disclosing any confidential information, including customer information, obtained from Nobel; directing Lynch not to perform any services for Astra Tech or any other entity that would lead to his revealing or relying upon Nobel's confidential information and trade secrets; directing Lynch not to contact or solicit business from any Nobel customer; and directing both defendants not to solicit or encourage any Nobel employee to leave Nobel for the purpose of becoming associated with Astra Tech. To obtain such an order, Nobel must establish that:

1) there is a reasonable likelihood that plaintiff will prevail on the merits of its claim;

2) irreparable harm will result because plaintiff has no adequate remedy at law;

3) the threatened injury to plaintiff outweighs any threatened harm from the injunction to defendant; and

4) [*3] a preliminary injunction will serve the public interest.

*Advent Electronics, Inc. v. Buckman, 112 F.3d 267, 274 (7th Cir. 1997).*

1    Defendant asserted at oral argument that Lynch is the only former Nobel employee currently working for Astra Tech who signed a restrictive covenant while at Nobel.

First, defendant Astra Tech claims that the court has no personal jurisdiction over it because the only contact it has with this district is its sales representative. The court finds that this is sufficient to establish personal jurisdiction over it. Astra Tech cites *Palmer v. Kawaguchi Iron Works, Ltd., 644 F. Supp. 327, 331 (N.D.Ill. 1986)*, claiming that the case stands for the proposition that having a sales representative in Illinois is not enough to establish personal jurisdiction over the company. The case actually holds that having a service representative in a particular state does not establish general personal jurisdiction over a company when the cause of action is unrelated [*4] to the representative and the alleged injury did not occur in Illinois. *Id. at 331* (product liability action). That is obviously not the case here. The Seventh Circuit has held that having a sales representative in Illinois for four years is enough to establish general jurisdiction over the company. *Michael J. Neuman & Associates v. Florabelle Flowers, Inc., 15 F.3d 721, 725 (7th Cir. 1994).* Certainly, having a sales representative in Illinois establishes jurisdiction over Astra Tech where allegations concerning that representative form the crux of the complaint.

The parties also dispute which state's law applies to this case. Under Illinois' choice of law provisions, which apply here, the law of the state with the most significant contacts to the employment contract applies. Plaintiff

claims that Illinois' law applies because Lynch was employed as a sales representative for the Illinois territory. Defendant points out that the plaintiff is a California corporation and that Lynch initially interviewed with Nobel and signed the agreement at issue in California when he was in that state for training. The choice is relevant to the court's inquiry into [*5] the enforceability of this employment agreement. California law provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." *Calif. Bus. & Prof. Code § 16600.* "The employer may restrain, by contract, only that conduct of a former employee that could be restrained under the law of unfair competition, absent the contract. Nevertheless, if the former employee reveals or uses confidential information so that his sales activities constitute unfair competition, then the contractual provision may be enforced." *Cambridge Filter Corp. v. International Filter Co., Inc., 548 F. Supp. 1301, 1305(D.Nev. 1982)* (citations omitted).

Illinois law permits covenants not to compete if they are reasonable as to time and territory. *Prairie Eye Center, Ltd. v. Butler, 305 Ill. App. 3d 442, 713 N.E.2d 610, 613, 239 Ill. Dec. 79 (4th Dist. 1999).* The court, however, finds that even under Illinois law, the employment agreement at issue here is unenforceable. At oral argument, plaintiff requested enforcement of the agreement in a much more limited manner than its terms would allow. [*6] By so doing, plaintiff has in effect conceded that the agreement's terms are overbroad. The court agrees. The agreement on its face would prevent Lynch from working for any Nobel competitor (direct or indirect) anywhere in the United States for two years. Although it is true that Illinois allows a court to "blue pencil" an agreement, whereby it adjusts the terms of an overbroad agreement to make them reasonable (and therefore enforceable), the contract at issue here would require adjustments in length, geography and permissible jobs and duties. *See, eg., McRand, Inc. v. Beelen, 138 Ill. App. 3d 1045, 486 N.E.2d 1306, 93 Ill. Dec. 471 (1st Dist. 1985).* The court declines to engage in such an extensive rewriting of the contract and finds that it is unenforceable as a matter of law. *See Telxon Corp. v. Hoffman, 720 F. Supp. 657, 666 (N.D.Ill. 1989).* It denies the motion for a temporary restraining order as to this count. Plaintiff's claim of misappropriation of trade secrets, however, remains viable.

To support that its customer list and list of top sales

representatives constitute trade secrets, plaintiff must establish that they are:

> 1) sufficiently [*7] secret to derive economic value, actual or potential, from not generally being known to other persons who can obtain economic value from its disclosure or use; and

> 2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1062/2(d); *see also* CA Civil § 3426.1(d). Defendant claims that plaintiff has no protectible interest in the identity of its customers because lists of dentists or periodontists are public knowledge and can even be found in the yellow pages. The court finds that the narrow group of Nobel's top 20 customers in the Illinois territory are not a generally known group, provide economic value to Nobel for that reason, and that Nobel has maintained sufficient efforts through confidentiality agreements with its employees to keep this information secret.

The court finds that Nobel has not established that it has a protectible interest in the identity of its best sales representatives, who are all at-will employees. First, the evidence indicated that Nobel did not take measures to keep this information secret and published the names of top sellers in the company newsletter. Second, learning which [*8] of Nobel's sales representatives are good performers can be accomplished through interviewing and other networking measures. The representatives themselves are under no obligation to keep their good performances a secret should they choose to interview with other companies. Because the court has limited the defendants' ability to use Nobel's confidential information, it also denies its request to prohibit Astra Tech from soliciting or hiring any of Nobel's current employees. It is not clear that these actions would be taking place in this district or that they would involve employees subject to this court's jurisdiction. Also, as the court has curtailed defendants' ability to use Nobel's confidential information, the benefit of luring Nobel's employees away is diminished. Without an allegation that they are misusing trade secrets or confidential information, Nobel cannot prevent competitors from offering its employees new positions or better terms of employment. *See Dames & Moore v. Baxter &*

*Woodman, Inc., 21 F. Supp.2d 817, 826 (N.D.Ill. 1998)*("a plaintiff will generally not have a cause of action for interference with a prospective business relationship against [*9] a bona fide competitor unless the circumstances indicate unfair competition").

As to the other requirements for a temporary restraining order, Nobel will experience harm if the order does not issue and its top customers are targeted and subjected to sales pitches from competitors. As this harm is almost impossible to quantify, no adequate remedy at law exists.

The harm to Lynch and Astra Tech is minimized by the narrow nature of the court's order. Lynch is prohibited only from contacting Nobel's top 20 customers. He is also free to establish a new customer base from publicly available lists of dentists, as counsel for Astra Tech indicated he had previously done for Nobel. An injunction will serve the public interest by protecting Nobel's efforts to develop and keep confidential a list of its top customers. *See Televation Telecommunication Systems, Inc. v. Saindon, 169 Ill. App. 3d 8, 522 N.E.2d 1359, 1362, 119 Ill. Dec. 500 (2nd Dist. 1988).*

For the foregoing reasons, the court grants a temporary restraining order against Lynch and Astra Tech directing them not to disclose or use in any manner the identities of the 20 Nobel customers that Nobel indicated accounted [*10] for 80% of the sales in Lynch's previous territory with Nobel. Lynch is directed not to contact or solicit business from any of these 20 Nobel customers or to perform services for Astra Tech or any other entity that would lead to his revealing or relying upon this confidential information. [2]

> 2 The parties indicated at oral argument that they would determine the best method of identifying the customers at issue without requiring Nobel to reveal additional confidential information.

The court also grants plaintiff's motion for expedited discovery as it provides a fuller record for the court when deciding whether to issue a preliminary injunction. The court notes that it has opted into *Fed.R.Civ.P. 26(a)(1)* and instructs the parties to comply with its provisions.

**ORDERED:** The court grants in part plaintiff's motion for a temporary restraining order. It grants plaintiff's motion for expedited discovery.

1999 U.S. Dist. LEXIS 23252, *10

ENTER:                                          United States District Judge

  George W. Lindberg                        DATED:  **[*11]**  SEP 16 1999



LEXSEE 2002 US DIST LEXIS 1217

**GILBERT ROBERGE and AMTECH, INC., Plaintiffs, v. QUALITEK INTERNATIONAL., INC., Defendant.**

**Case Number: 1 C 5509**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2002 U.S. Dist. LEXIS 1217*

**January 25, 2002, Decided**
**January 28, 2002, Docketed**

**DISPOSITION:**  [*1]  Plaintiffs' motion for summary judgment granted. Defendant's motion to dismiss denied.

**COUNSEL:** For GILBERT ROBERGE, AMTECH, INC., plaintiffs: David Brian Ritter, Marlene J. Igel, Altheimer & Gray, Chicago, IL.

For GILBERT ROBERGE, AMTECH, INC., plaintiffs: David B. Zabel, Cohen and Wolf PC, Bridgeport, CT.

For QUALITEK INTERNATIONAL, INC., defendant: Panos T. Topalis, Stephen Sloan Weiss, Tribler, Orpett & Crone, Chicago, IL.

**JUDGES:** Wayne R. Andersen, United States District Judge.

**OPINION BY:** Wayne R. Andersen

**OPINION**

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on plaintiffs Gilbert Roberge and Amtech, Inc.'s motion for summary judgment pursuant to *Federal Rule of Civil Procedure 56* and defendant Qualitek International's motion to dismiss

for lack of subject matter jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(1)*. For the following reasons, the plaintiffs' motion for summary judgment is granted and the defendant's motion to dismiss is denied.

**BACKGROUND**

Plaintiff Gilbert Roberge ("Roberge"), a Canadian citizen, has been employed in the electronics [*2] industry since 1980. According to the record in this case, Roberge was employed at CAE Electronics from 1980 to 1999 where he had supervisory and manufacturing responsibilities. Specifically, the record indicates that, while at CAE Electronics, Roberge worked on special projects such as building the circuit board for the cameras that were placed on the Canadian Arm of a project for NASA. (Roberge Dep. at 17.) In the fall of 1998, Roberge began working for a distributor of defendant Qualitek's products, Airtron Electronics. He was employed at CAE Electronics and Airtron Electronics simultaneously for 6 months. At Airtron, Roberge sold consumable and capital equipment for the electronics industry in Quebec. (Roberge Dep. at 21-24.).

Plaintiff Amtech, Inc. ("Amtech") is a Connecticut corporation with its principal place of business in Branford, Connecticut. Amtech is engaged in the business of manufacturing and selling solder products for use in the electronics industry, and it conducts business

both nationally and internationally. It is apparent from the record that Amtech is a competitor with Qualitek in the solder products business.

Defendant Qualitek International, Inc. ("Qualitek") [*3] is an Illinois corporation with its principal place of business in Addison, Illinois. Qualitek is an international supplier of high quality solder paste, soldering chemicals, and advanced solder products with approximately 300 employees worldwide.

In October of 1999, Ted Marek, National Sales Manager for Qualitek, approached Roberge regarding the possibility of him coming to work for Qualitek on a full-time basis. After a few weeks of negotiation, Roberge accepted Qualitek's offer of employment as Global Technical Support Manager, and he began work in that capacity in November of 1999. His responsibilities as Global Technical Support Manager were to include supporting Qualitek's products and salespeople by making recommendations to Qualitek's customers regarding problems on the production line. Specifically, Roberge was to advise certain Qualitek customers on how to better the performance of Qualitek's product. (Roberge Dep. at 47-49.)

Included with the materials Roberge received around the time he began his employment with Qualitek was a contract entitled "Employment Contract Protecting Trade Secrets and Assignment of Patent Rights" (hereinafter the "Employment Contract"). According [*4] to the record, Roberge understood that his employment with Qualitek was contingent upon his agreement to the Employment Contract as drafted. While the exact date of the execution of the Employment Contract is in dispute, both parties agree that Roberge eventually did sign the contract.

Section IX of the Employment Contract contains, *inter alia*, a restrictive covenant not to compete, which is at issue in the instant case. In relevant part, Section IX provides:

> that upon termination of such employment for any cause whatsoever, [Roberge] will not either directly or indirectly, for himself or for any third party, without prior written authorization form [sic] [Qualitek], engage in competition with [Qualitek] for a period of two (2) years.

The Employment Contract also contains a provision which states that during his employment at Qualitek, and at all times thereafter, Roberge must "hold in secrecy . . . each and all of [Qualitek's] trade secrets, including secret processes, secret machines, secret formulas, and secret devices, now known to [Roberge] and those disclosed or divulged to [Roberge] by [Qualitek]. (Employment Contract, Section VIII.) Roberge [*5] performed his duties at Qualitek, pursuant to these conditions, from November, 1999 until April, 2001.

However, on or about April 12, 2001, Roberge's employment with Qualitek was terminated without cause. He was told that he was being laid off due to an industry slowdown and lack of available work at Qualitek. After his discharge from Qualitek, Roberge, as requested, returned the laptop computer that had been issued to him by Qualitek, and he stated in his declaration that he did not keep any documents concerning his employment at Qualitek other than copies of his job offer letter and the Employment Contract he had signed. (Roberge Decl. at P 13.)

Shortly after his departure from Qualitek, Roberge contacted Amtech to inquire about potential employment opportunities with that company. In so doing, Roberge disclosed to the relevant individuals at Amtech that he had signed the Employment Contract with Qualitek and that said contract contained the covenant not to compete. As a result of the discussions between Roberge and Amtech, and apparently because Amtech was impressed with Roberge's qualifications, Amtech offered Roberge a position as Product Support Manager. However, because Amtech [*6] was concerned about the restrictions contained in the Employment Contract, Amtech's offer of employment to Roberge was and continues to be conditioned upon either Qualitek's written authorization that Roberge may engage in such employment with Amtech or a declaration from a court of competent jurisdiction that the covenant not to compete is unenforceable.

On June 14, 2001, in an attempt to avoid a legal dispute, Amtech wrote to Qualitek requesting confirmation that Qualitek did not object to the employment of Roberge by Amtech. On June 19, 2001, Qualitek responded to Amtech's letter by stating that they did in fact take issue with Roberge's potential employment at Amtech. Specifically, in its June 19 letter, Qualitek stated "we intent [sic] to pursue any breach of

our Agreement in all legal avenues that are open to us . . . . Mr. Roberge, having been privileged to proprietary information, and therefore under the circumstances, will put us in a disadvantageous position if directly employed by our competitor."

Notwithstanding the legal position taken by Qualitek, Roberge has accepted Amtech's conditional offer of employment. However, in light of Qualitek's refusal to consent to his [*7] employment with Amtech, he is unwilling to commence employment with Amtech if the restrictions contained in the Employment Contract are found to be enforceable and such employment would constitute a breach of the Employment Contract. Likewise, Amtech is unwilling to employ Roberge without the assurance that doing so is lawful and not prohibited by the Employment Contract. Consequently, since June, 2001, Roberge has been working in Canada for substantially less than he would have been making at Amtech.

In August, 2001, Roberge and Amtech filed a declaratory judgment action against Qualitek, pursuant to *28 U.S.C. § 2201*, seeking an order from this Court declaring the covenant not to compete in the Employment Contract void and unenforceable. The intended effect of this declaratory judgment would be to permit Roberge to commence his position with Amtech. Concurrent with the filing of the complaint for declaratory judgment, Roberge and Amtech filed the instant motion for summary judgment pursuant to *Federal Rule of Civil Procedure 56*.

## DISCUSSION

### I. Motion for Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, [*8] and admissions of file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons, Co., 42 F.3d 439, 443 (7th Cir. 1994)*. The non-moving party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A genuine

dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

In making this determination, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party and should not make credibility determinations or weigh evidence. [*9] *Association Milk Producers, Inc. v. Meadow Gold Dairies, Inc., 27 F.3d 268, 270 (7th Cir. 1994)*. The non-moving party must support its contentions with admissible evidence and may not rest upon mere allegations in the pleadings or conclusory statements in affidavits. *Celotex, 477 U.S. at 324*. The plain language of *Rule 56(c)* mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to its case and on which that party will bear the burden of proof at trial. The production of only a scintilla of evidence will not suffice to oppose a motion for summary judgment. *Anderson, 477 U.S. at 252*.

In this case, the plaintiffs have argued they are entitled to summary judgment on their complaint for declaratory judgment because the competition restrictions contained in Section IX of the Employment Contract are unreasonably broad according to Illinois law, and thus void and unenforceable. Specifically, the plaintiffs argue that, because this particular restrictive covenant contains no geographic limitation, it essentially restricts Roberge's ability to earn a living in his chosen profession [*10] not only in this country but also potentially anywhere else in the world for a period of two years. As a result, plaintiffs contend that the covenant not to compete is unreasonably broad, against public policy, and void as a matter of law.

The defendant counters these arguments by suggesting that, though the restrictive covenant admittedly contains no geographic limits, it is enforceable because it was "reasonably" drawn to protect Qualitek's legitimate business interests. In particular, Qualitek argues that its covenant not to compete is legitimate because it does business nationwide, and the purpose of the restriction is to protect Qualitek from losing any customers, wherever they may be, to former employees who presumably have gained special knowledge and familiarity with the customers' needs. In the alternative, Qualitek requests that if we determine that the restrictive covenant is overly broad as a matter of law, then we should "blue-pencil" or modify the Employment Contract

to either prohibit Roberge from working at Amtech or prohibit him from having contact with Qualitek's customers that are not customers of Amtech. For the following reasons, we conclude that the plaintiffs [*11] are entitled to judgment as a matter of law on their complaint for a declaratory judgment.

At the outset, we note that both parties agree that the Employment Contract contains a choice of law provision which states that the agreement "shall be construed under the laws of the State of Illinois." (Employment Contract at 3.) Consequently, under Illinois law, the enforceability of a covenant not to compete is a question of law, and thus amenable to resolution by means of a motion for summary judgment. See Lyle R. Jager Agency, Inc. v. Steward, 253 Ill. App. 3d 631, 625 N.E.2d 397, 400, 192 Ill. Dec. 437 (Ill. App. Ct. 1993).

In Illinois, restrictive covenants are disfavored in the law and closely scrutinized because they are repugnant to the public policy encouraging an open and competitive marketplace. Bishop v. Lakeland Animal Hosp., 268 Ill. App. 3d 114, 644 N.E.2d 33, 36, 205 Ill. Dec. 817 (Ill. App. Ct. 1994). This is especially true in the case of covenants not to compete, which Illinois courts have held to be restraints on trade. Office Mates 5, North Shore, Inc. v. Hazen, 234 Ill. App. 3d 557, 599 N.E.2d 1072, 1079, 175 Ill. Dec. 58 (Ill. App. Ct. 1992). [*12] As a result, courts will only enforce the provisions of a restrictive covenant if the time and geographical limitations are reasonably necessary to protect a legitimate business interest of the employer. Trailer Leasing Co. v. Associates Commercial Corp., 1996 U.S. Dist. LEXIS 9654, 1996 WL 392135, at *1 (N.D. Ill. July 10, 1996) (applying Illinois law); Abel v. Fox, 274 Ill. App. 3d 811, 654 N.E.2d 591, 593, 211 Ill. Dec. 129 (Ill. App. Ct. 1995). Geographic limitations on the scope of a restrictive covenant are significant because Illinois courts will not enforce agreements that restrict an employee's ability to work for a competitor in any manner whatsoever. See Telxon Corp. v. Hoffman, 720 F. Supp. 657, 665 (N.D. Ill. 1989); North Am. Paper Co. v. Unterberger, 172 Ill. App. 3d 410, 526 N.E.2d 621, 623, 122 Ill. Dec. 362 (Ill. App. Ct. 1988).

This is not to say, of course, that all restrictive covenants which do not contain geographic limitations are per se unenforceable. Illinois courts have recognized a distinction between those agreements that contain a blanket prohibition on competition and those that limit an employee from engaging [*13] in particular types of activities with competitors after they leave the employ of the former employer. The most prevalent of these "activity restraints" is the soliciting of the former employer's customers. See Eichmann v. Nat'l Hosp. and Health Care Services, Inc., 308 Ill. App. 3d 337, 719 N.E.2d 1141, 1147, 241 Ill. Dec. 738 (Ill. App. Ct. 1999). In Eichmann, the Illinois Appellate Court noted the difference between these types of restrictive covenants by stating that the "distinction between a blanket prohibition on competition and an activity restraint is important because the lack of a geographical restriction does not automatically invalidate a post-employment restraint where the geographical prohibition is qualified by an activity restraint." Id. (emphasis in original.) The issue then in the instant case is whether the restrictive covenant contained in Section IX of the Employment Contract is a blanket restriction or an activity restraint.

The logical place to begin this analysis is of course with the actual text of the agreement entered into by Roberge and Qualitek. The first part of Section IX contains a disclosure covenant in which Roberge agreed [*14] not to disclose, either during or after his employment with Qualitek, any confidential or proprietary information he received while employed there. Roberge has stated in his declaration that he never came into contact with any confidential or proprietary information while employed at Qualitek, and Qualitek has not identified any confidential information, trade secret, or secret process shared with Roberge during his employment. Rather, Qualitek has only argued that Roberge was familiar with certain undisclosed research information as well as the particular product needs of some of Qualitek's larger customers. As this type of information was readily accessible to not only Qualitek employees but also to Qualitek customers (particularly the product requirements of those customers), we cannot justifiably restrict Roberge's future employment in the solder products industry on this basis. This conclusion is further bolstered by Qualitek's inability to identify even one trade secret or secret process which Roberge was allegedly privy to that could endanger Qualitek's competitive advantage in the solder products industry.

That having been said, we next turn to the second part of Section IX [*15] of the Employment Contract, which is the actual covenant not to compete. It states that "upon termination of . . . employment for any cause whatsoever, [Roberge] will not either directly or

indirectly . . . engage in competition with [Qualitek] for a period of two (2) years." Even granting this language the most generous interpretation, there is no way it can be read other than to constitute a blanket prohibition on competition. The restrictive covenant is not limited to a particular type of activity, such as the solicitation of customers Roberge had contact with while at Qualitek, nor does it contain any other activity restraint. Rather, it unequivocally states that Roberge cannot work for any company that is a direct or indirect competitor of Qualitek's, regardless of where that competitor operates. In fact, Qualitek has conceded in its papers that they view the covenant not to compete as having global effect, suggesting that if Roberge wanted to work for a company in Japan that competes with Qualitek in the solder products market, he would be unable to do so. *But see Unterberger, 526 N.E.2d at 625; Dryvit Sys., Inc. v. Rushing, 132 Ill. App. 3d 9, 477 N.E.2d 35, 38, 87 Ill. Dec. 434 (Ill. App. Ct. 1985)* [*16] ("the unlimited geographic constraints . . . are patently beyond the needs of the employer to protect his interest and are unduly harsh on the employee.")

Qualitek attempts to defend its restrictive covenant by arguing that, even though there is no geographic limitation in the restrictive covenant, it is nevertheless still enforceable because it is necessary to protect its business interests not only in this country but in other countries around the world. Qualitek supports this broad argument by stating that the area in which Roberge is restricted from working (i.e. the planet Earth) is "coextensive with the area in which the employer is doing business." (Def. Response at 7.) In particular, Qualitek asserts that because it has "customers globally and has competitors throughout the United States . . . inserting an arbitrary boundary such as prohibiting Roberge from competing with Qualitek in the state of Illinois . . . would not protect Qualitek's legitimate interests." (*Id.* at 8.) While this is perhaps the most logical argument the defendant could make in response to the plaintiffs' motion, it is a position that has been rejected countless times by both state and federal courts [*17] in Illinois. *See, e.g., Telxon, 720 F. Supp. at 664-65* (motion for preliminary injunction denied because restrictive covenant lacking any identifiable geographic limitation would have even prevented employee from "working as competitor's janitor"); *Dryvit Sys., 477 N.E.2d at 38* ("the unlimited geographic constraints on competitive activities . . . and the further restriction from association with a corporation whose activities are competitive in the

continental United States are patently beyond the needs of the employer to protect his interest and are unduly harsh on the employee"); *Egnell, Inc. v. Weniger, 94 Ill. App. 3d 325, 418 N.E.2d 915, 918, 49 Ill. Dec. 895 (Ill. App. Ct. 1981)* (pursuant to restrictive covenant which contained no actual geographic limitation, employee would not have been permitted to work anywhere in the world for a firm that competed with employer somewhere in the U.S. "The burden placed on [employee] far exceeds what would have been necessary for the protection of plaintiff's interest.").

Given this compelling authority, we reject Qualitek's argument that the lack of geographic limitation in Section IX [*18] is acceptable because it is necessary to protect Qualitek from the potential loss of some its customers located anywhere throughout the world. The covenant not to compete is so broad that, like in *Texlon*, it is conceivable that Roberge would be prohibited from working as a janitor for a company that, either directly or indirectly, competed with Qualitek in the solder products industry. There is simply no legitimate business interest of Qualitek that can justify such a ridiculous result.

Further, Qualitek attempts to avoid the inevitable in this case by suggesting in its papers that there is at least one genuine issue of material fact which prevents our granting of the plaintiffs' motion for summary judgment. Specifically, Qualitek contends that there is a material factual dispute concerning the execution of the Employment Contract. Roberge asserts that he did not actually sign the Employment Contract until January, 2000, at which time he alleges that he was required to post-date his signature to November 8, 1999. Qualitek, on the other hand, argues that Roberge actually signed the contract on November 8, 1999 (the date indicated next to Roberge's signature) and that he did not [*19] sign it in January, 2000. We conclude that this perceived genuine issue of material fact is really just a red herring, and a particularly odoriferous one at that.

Qualitek must do more than simply show that there is some trivial doubt as to the material facts in this case. *Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. It must present "specific facts showing that there is a genuine issue for trial," *Fed.R.Civ.P. 56(e)*, and only if a reasonable jury could render a verdict for them can they defeat summary judgment. *Jordan v. Summers, 205 F.3d 337, 342 (7th Cir. 2000)*. Material facts are those

pertinent to the outcome of the issues identified in the motion for summary judgment. *See Malec v. Sanford, 191 F.R.D. 581, 583 (N.D. Ill. 2000).* In this case, the execution date of the Employment Contract is irrelevant to the primary issue presented by the plaintiffs in their summary judgment motion - whether the restrictive covenant is so broad as to be void and unenforceable. This is so because neither party disputes the fact that the Employment Contract was fully executed, **[*20]** regardless of the date on which Roberge actually signed it, at least a year before Roberge was discharged by Qualitek.

Finally, Qualitek requests that, if we intend to find the restrictive covenant unenforceable as written, then we should utilize our equitable power to modify the Employment Contract so as to prevent Roberge from having contact with any Qualitek customer. While a trial court may employ equity principles and modify the restraints embodied in an employment contract and enforce the restraints as modified, the fairness of the restraints imposed in the written agreement is a relevant consideration to the application of such equity principles. *See Unterberger, 526 N.E.2d at 625; House of Vinson, Inc. v. Hiyane, 37 Ill. 2d 32, 225 N.E.2d 21, 25 (1967).* In this case, we will not exercise our discretion to "blue-pencil" the contract, but rather we hold that the covenant not to compete as executed is unenforceable as a matter of law. In so doing, we hope to encourage employers to write contracts that are more narrowly tailored to meet their individual needs, rather than overly broad covenants which restrict competition in the marketplace for **[*21]** qualified employees. *See also Trailer Leasing Co., 1996 U.S. Dist. LEXIS 9654, 1996 WL 392135 at *4; Telxon, 720 F. Supp. at 666.*

Therefore, based on the arguments raised in the briefs and for the reasons stated above, we declare that the restrictive covenant contained in Section IX of the Employment Contract is overbroad in that it contains no geographic limitation on its scope. Accordingly, we conclude that the restrictive covenant is unenforceable as a matter of law and therefore void. The plaintiffs' motion for summary judgment is granted.

**II. Motion to Dismiss**

Concurrent with the plaintiffs' motion for summary judgment, defendant Qualitek also filed a motion to dismiss the complaint for lack of subject matter jurisdiction pursuant to *Federal Rule of Civil Procedure* 12(b)(1). Specifically, Qualitek alleges that the plaintiffs have failed to establish that the amount in controversy in this declaratory action is at least $ 75,000, as required by *28 U.S.C. § 1332.* We disagree.

In a declaratory judgment action, we measure the amount in controversy by the value of the "object of the litigation." *Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 347, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977).* **[*22]** "When deciding whether a claim meets the minimum amount in controversy, the plaintiff's evaluation of the stakes must be respected." *Barbers v. Bishop, 132 F.3d 1203, 1205 (7th Cir. 1997).* If the amount in controversy is uncontested, the court "will accept the plaintiff's good faith allegation of the amount in controversy unless it 'appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount.'" *Rexford Rand Corp. v. Ancel, 58 F.3d 1215, 1218 (7th Cir. 1995)* (quoting *St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 289, 82 L. Ed. 845, 58 S. Ct. 586 (1938)); see also Herremans v. Carrera Designs, Inc., 157 F.3d 1118, 1121 (7th Cir. 1998).* However, when the amount in controversy is challenged, the party asserting jurisdiction is required to submit "competent proof" that the amount in controversy exceeds $ 75,000. *See Target Mkt. Publishing, Inc. v. ADVO, Inc., 136 F.3d 1139, 1142 (7th Cir. 1998); Rexford Rand Corp., 58 F.3d at 1218.* "Competent proof means proof to a reasonable probability that jurisdiction exists." *Id. at 1218* **[*23]** (internal quotations and citation omitted).

In this case, we conclude that the plaintiffs have submitted competent proof in their response to the motion to dismiss to establish that the amount in controversy exceeds $ 75,000. The central dispute in this motion to dismiss is the value of the compensation Roberge was potentially required to forego as a result of the restrictive covenant contained in the Employment Contract. Qualitek argues that Roberge is currently earning $ 70,000 plus commission in his present job in Canada and that he will actually lose money over the next two years if he accepts employment with Amtech. To Qualitek, this means there actually is no amount in controversy in this case. The plaintiffs, on the other hand, contend that enforcement of the two-year restrictive covenant will cause Roberge to lose $ 150,000 of income from Amtech as well as cause Amtech to lose the value of Roberge's services. We agree with the plaintiffs.

The plaintiffs have submitted compelling proof in the form of declarations and deposition testimony that the minimum amount in controversy in this case is $ 88,000 and the maximum amount is $ 150,000. The $ 88,000 figure comes from a recognition [*24] that the $ 70,000 amount Qualitek cites as Roberge's current salary in Canada is actually based on the Canadian dollar and not the U.S. dollar. Under the current exchange rate, Roberge is making approximately $ 44,000 (U.S. dollars) per year, plus an employer funded pension contribution. As a result, over the course of the two year restrictive period in the Employment Contract, Roberge stands to lose at least $ 88,000 in income. Therefore, we conclude that the amount in controversy in this case exceeds the statutory amount of $ 75,000. The defendant's motion to dismiss is denied.

**CONCLUSION**

For the foregoing reasons, we grant the plaintiffs' motion for summary judgment pursuant to *Federal Rule of Civil Procedure 56.* The restrictive covenant not to compete included in Section IX of the Employment Contract is unenforceable as a matter of law and therefore void. If Roberge and Amtech still wish to proceed with their employment relationship, they are free to do so. The defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(1)* is denied. This is a final and appealable order. This case is terminated. The ruling date [*25] set for

February 28, 2002 is hereby stricken.

It is so ordered.

Wayne R. Andersen

United States District Judge

Dated: January 25, 2002

**JUDGMENT IN A CIVIL CASE** - Date: 1/26/2002

Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that for the foregoing reasons, we grant the plaintiffs' motion for summary judgment [7-1] pursuant to FRCP 56. The restrictive covenant not to compete included in Section IX of the Employment Contract is unenforceable as a matter of law and therefore void. If Roberge and Amtech still wish to proceed with their employment relationship, they are free to do so. The defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to FRCP 12(b)(1) [14-1] is denied. This is a final and appealable order. This case is terminated. The ruling date of 2/28/2002 is hereby stricken.

Date: 1/26/2002



LEXSEE 1996 U.S. DIST. LEXIS 9654

**TRAILER LEASING CO., a Division of Keller Systems, Inc. a New York Corporation, Plaintiff, v. ASSOCIATES COMMERCIAL CORP. a Delaware corporation, ASSOCIATES RENTAL SYSTEMS, INC., a Delaware corporation, and GARY CHASE, Defendants.**

No. 96 C 2305

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*1996 U.S. Dist. LEXIS 9654*

**July 9, 1996, Decided
July 10, 1996, DOCKETED**

**DISPOSITION:** [*1] Trailer Leasing Company's restrictive covenants with Gary Chase are unenforceable.

**COUNSEL:** For TRAILER LEASING COMPANY, a Division of Kellers Systems, Inc., a New York corporation, plaintiff: Ronald Hanley Balson, Ronald H. Balson, P.C., Chicago, IL. John M. Rogers, Hill, Heard, Gilstrap, Goetz & Moorhead, Arlington, TX.

For ASSOCIATES COMMERCIAL CORPORATION, a Delaware corporation, ASSOCIATES RENTAL SYSTEMS, INC., a Delaware corporation, GARY CHASE, defendants: Stephen Curtis Carlson, David M. Schiffman, Sidley & Austin, Chicago, IL. Lisa Maria Cipriano, Sidley & Austin, Chicago, IL.

For GARY CHASE, counter-claimant: Stephen Curtis Carlson, David M. Schiffman, Sidley & Austin, Chicago, IL. Lisa Maria Cipriano, Sidley & Austin, Chicago, IL.

For TRAILER LEASING COMPANY, counter-defendant: Ronald Hanley Balson, Ronald H. Balson, P.C., Chicago, IL. John M. Rogers, Hill, Heard, Gilstrap, Goetz & Moorhead, Arlington, TX.

**JUDGES:** David H. Coar, U.S. District Judge

**OPINION BY:** David H. Coar

**OPINION**

**MEMORANDUM OPINION AND ORDER**

[*2] On May 6, 1996, this court entered a temporary restraining order *nunc pro tunc* to the conclusion of the hearing on April 29, 1996 on plaintiff's motion for a temporary restraining order. Also on May 6, 1996, the defendants requested an opportunity to brief the issue of the enforceability/validity of the restrictive covenants which formed part of the basis of the temporary restraining order. Both parties have since submitted legal memoranda on this issue.

The question before the court is the enforceability of the covenant not to compete, non-disclosure agreement, and non-solicitation agreement entered into between plaintiff, Trailer Leasing Company ("TLC") and defendant Gary Chase ("Chase"). [1] Defendants, Associates Commercial Corporation ("Commercial"), Associates Rental Systems, Inc. ("Rental"), and Chase contend that this court should not enforce the covenants.

    1 Both the covenant not to compete and the non-disclosure agreement contain a

non-solicitation provision. For the sake of clarity, the court has elected to address the non-solicitation agreement as if it were a separate restrictive covenant.

## [*3] I. RESTRICTIVE COVENANTS

Illinois courts and federal courts applying Illinois law have frequently ruled on the enforceability of restrictive covenants. The enforceability of a restrictive covenant presents a question of law. *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557, 599 N.E.2d 1072, 1079, 175 Ill. Dec. 58 (1st Dist. 1992). Courts do not favor restrictive covenants entered into between an employer and employee. *Jefco Laboratories, Inc. v. Carroo*, 136 Ill. App. 3d 793, 483 N.E.2d 999, 1001, 91 Ill. Dec. 513 (1st Dist. 1985). Thus, courts carefully scrutinize restrictive covenants. *Id.* A court will only enforce the provisions of a restrictive covenant if the time and geographical limitations are reasonably necessary to protect a legitimate business interest of the employer. *Office Mates, 234 Ill. App. 3d at 568, 599 N.E.2d at 1080.* A court, at its discretion, may modify or "blue pencil" an unreasonable agreement in order to make it reasonable. *Telxon Corp. v. Hoffman*, 720 F. Supp. 657, 666 (N.D. Ill. 1989); *Arpac Corp. v. Murray*, 226 Ill. App. 3d 65, 589 N.E.2d 640, 652, 168 Ill. Dec. 240 (1st [*4] Dist. 1992). In determining whether to modify a restrictive covenant, a court should consider the fairness of the original restraint. *Wyatt v. Dishong*, 127 Ill. App. 3d 716, 469 N.E.2d 608, 610, 83 Ill. Dec. 1 (5th Dist. 1984). However, such a consideration is less important if the covenant contains a severability clause. *Id.*

A. Covenants Not to Compete

A covenant not to compete amounts to a restraint on trade. *Office Mates, 234 Ill. App. 3d at 568, 599 N.E.2d at 1080.* Therefore, courts must carefully scrutinize such a covenant to ensure that its intended effect is not to hinder competition *per se*. **Id.** Illinois case law has identified the following two general situations where a legitimate business interest of an employer may be found for purposes of enforcing a covenant not to compete:

(1) where, by the nature of the business, plaintiff has a near-permanent relationship with its customers and but for his employment, defendant would not have had contact with them; or (2) where the former employee learned trade secrets or

acquired other confidential information through his employment with plaintiff and subsequently attempted to use [*5] it for his own benefit.

*Tyler Enterprises of Elwood, Inc. v. Shafer*, 214 Ill. App. 3d 145, 573 N.E.2d 863, 866, 158 Ill. Dec. 50 (3d Dist. 1991); *Office Mates, 234 Ill. App. 3d at 569, 599 N.E.2d at 1080; Millard Maintenance Service Co. v. Bernero*, 207 Ill. App. 3d 736, 746-47, 566 N.E.2d 379, 152 Ill. Dec. 692 (1st Dist. 1990).

Illinois courts consider the following factors to determine whether a near-permanent relationship exists between an employer and its patrons/customers:

(1) the number of years the employer required to develop the clientele, (2) the amount of money the employer invested in developing the clientele, (3) the degree of difficulty in developing the clientele, (4) the amount of personal customer contact by the employee, (5) the extent of the employer's knowledge of its clientele, (6) the length of time the customers have been associated with the employer, and (7) the continuity of the employer-customer relationship.

*Millard, 207 Ill. App. 3d at 747, 566 N.E.2d at 386* (quoting *A.B. Dick Co. v. American Pro-Tech*, 159 Ill. App. 3d 786, 792, 514 N.E.2d 45, 112 Ill. Dec. 649 (1st Dist. 1987)). [*6] Courts have also found that the amount of time and money it takes for an employer to cultivate its clientele serves as a good indicator of how long the firm and its clients expect to remain affiliated. [2] **Id.**

2  While acknowledging the aforementioned factors, the Illinois First District Appellate Court recently set forth a different method of determining near-permanent relationships for purposes of enforcing a covenant not to compete. See *Office Mates, 234 Ill. App. 3d at 570-72, 599 N.E.2d at 1081-82.* Under this method, a court determines near-permanent relationships based on the nature of the business involved. *Id. at 571, 599 N.E.2d at 1082.* Companies which are engaged in professional practices, or sell unique products, or enter into contracts with their customers will enjoy a high degree of success

under this test, while plaintiffs whose businesses do not generate customer loyalty will experience a very low level of success. *Id. at 571-72, 599 N.E.2d at 1081-82.* Businesses that enjoy a low level of success do not sell unique products or provide unique personal service. **Id.** These businesses tend to rely on their sales forces to employ techniques such as "cold calling" to acquire new customers. **Id.** As a result, customers of these businesses generally are known to all involved in the industry and are not considered to have "near-permanent" relationships with one particular company. **Id.**

**[*7]**

With respect to an employee's personal use of trade secrets or other confidential information, the Illinois Trade Secrets Act ("ITSA") governs. *Section 1065/2* of the ITSA defines "trade secret" as:

> information, including, but not limited to . . . financial data, or list of actual or potential customers or suppliers, that:

> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

*765 ILCS § 1065/2* (1995).

In its complaint, plaintiff alleges that it has a proprietary interest in its customers due to the near-permanent relationships it maintains with a substantial number of its customers. (Compl., at PP52-53). Furthermore, plaintiff alleges that Chase, Commercial, and Rental violated the ITSA as a result of Chase's disclosure of confidential TLC information which he only obtained as result of his employment at TLC. (*Id., at PP16-25*). Given the procedural posture of this matter, the court accepts plaintiff's well-pleaded **[*8]** factual allegations as true and examines this issue in the light most favorable to plaintiff. Accordingly, the court will assess the reasonableness and enforceability of the restrictive covenants, assuming that TLC has a legitimate

business interest in Chase not disclosing any confidential information or working for a competitor within the geographical boundaries set forth in the covenants.

According to defendants, the covenant not to compete is unenforceable for three reasons. First, defendants argue that the covenant's restrictions are too broad. (Def. Mem., at 5). Second, defendants argue that the non-solicitation restriction within the covenant is too broad. (*Id., at 6*). Third, defendants argue that the covenant is unenforceable because it restricts Chase from working within fifty miles of the Baltimore area even though Chase has not worked in Baltimore for three years. (*Id., at 4*).

Defendants argue that this court should not enforce the covenant because its language which prohibits Chase from working "directly or indirectly, in the business of Employer [TLC] . . . or a similar business dealing in related products to those rented, leased, or sold by Employer, either **[*9]** as principal, partner, agent, employee, trustee, lender of assets, or as a stockholder, director or officer of any corporation or association, entity or in any other manner or capacity whatsoever . . ." is too broad. (Def. Mem., at 5). To demonstrate this point, Defendants contend that this provision effectively prohibits Chase from working as a janitor at a company engaging in similar business to TLC. (Id.). Defendants further contend that since the Employment Agreement defines TLC's business as "leasing, renting, selling, and using all sorts or transportation" the covenant effectively prevents Chase from working as a car salesman, a position that could not possibly affect TLC's business. (*Id., at 6*).

Illinois courts will not enforce agreements that restrict an employee's ability to work for a competitor in any manner whatsoever. *Telxon, 657 F. Supp. at 665; North American Paper Co. v. Unterberger, 172 Ill. App. 3d 410, 526 N.E.2d 621, 623, 122 Ill. Dec. 362 (1st Dist. 1988)* (hereinafter **NAPCO**). In **Telxon**, the court did not enforce an activity restriction which prevented an employee from working for a business "engaged in any manner **[*10]** in, or [which] otherwise competes with, the business of the COMPANY . . . ." *657 F. Supp. at 665* (emphasis in original). Similarly, in **NAPCO**, the court did not enforce an agreement which prevented an employee from becoming an "employee . . . or other affiliate of any organization . . . which is engaged or becomes engaged in competition . . . with the company"

because it prevented the employee from "associating with any competitor in any capacity whatsoever . . . ." *172 Ill. App. 3d at 413-14, 526 N.E.2d at 623.* Following **Telxon** and **NAPCO**, this court finds that the activities restriction contained in the covenant not to compete is too broad. As written, the covenant restricts Chase from working for any company, in any manner, in any business "leasing, renting, selling, and using all sorts of transportation" or any similarly situated business dealing in related products. The universe of companies falling within the broad sweep of these loosely defined terms is simply too large to be considered reasonable.

For similar reasons, the broad language of the non-solicitation restriction contained within the covenant not to compete renders it unenforceable. **[*11]** The non-solicitation provision restricts Chase from soliciting, diverting, or taking away any of TLC's customers or prospective customers. (Ex. 1, at PP4-5). In **Millard**, the court upheld a non-solicitation provision which stated that an employee could not "own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control of any business . . . ." that "solicits, diverts, takes away or attempts to solicit divert, or take away customers of the Employer . . ." *207 Ill. App. 3d at 748, 556 N.E.2d at 386.* In contrast to **Millard**, TLC's non-solicitation provision restricts Chase from soliciting, diverting, or taking away any of TLC's *prospective* customers. Since TLC cannot possibly have a near-permanent relationship with a prospective customer, this provision does not meet the requirements for finding a legitimate business interest. Thus, the phrase "prospective customers" is too broad to be enforced.

Finally, defendants argue that TLC does not have a protectable interest in keeping Chase outside of a fifty-mile radius of Baltimore, since Chase has not worked in Baltimore in three years. (Def. Mem., at 4). Courts look to the geographic area in which an employer does business in order to determine if a restrictive covenant is reasonable. *Arpac, 226 Ill. App. 3d at 77, 589 N.E.2d at 650.* The rationale behind limiting the geographical scope of a covenant is that an employee should only be excluded from an area in which he established certain relationships with the employer's customers as a result of his employment. *George S. May Int'l Co. v. International Profit Associates, 256 Ill. App. 3d 779, 628 N.E.2d 647, 655 (1st Dist. 1993).* If the restricted area is one in which the employer does

business, the restriction is considered reasonable. *Arpac, 226 Ill. App. 3d at 77,* 589 N.Ed. 2d at 650. In *Arpac*, the court refused to an enforce a covenant entered into between a shrink wrap machine company and an employee. *Id. at 651.* The court reasoned that the covenant's "virtually unlimited geographic restraints" in addition to its restrictions on the employee from associating with any company that competed with the employer were too broad. **Id.** In **International Profit**, the court did not enforce covenants which prevented employees from working in states which they never worked in while employed for their employer. *256 Ill. App. 3d at 790-91, 628 N.E.2d at 655.*

While **Arpac** and **International Profit** can be distinguished because Chase actually worked in Baltimore, it is unclear whether Chase established "certain relationships" with any of TLC's Baltimore customers. The court does not need to resolve this issue, however, because the covenant not to compete is independently rendered unenforceable by its over broad language. While this court has the option of blue-pencilling the covenant, it declines to do so since substantial modifications/deletions to the covenant would be required. Instead, this court elects **[*12]** to follow the example of the court in **Telxon**. In that case, the court declined to blue-pencil an over broad covenant not to compete because it wanted to encourage employers to write restrictive contracts more narrowly. *Telxon, 657 F. Supp. at 666.*

Plaintiff looks to *Gillespie v. Carbondale and Marion Eye Centers, Ltd., 251 Ill. App. 3d 625, 622 N.E.2d 1267, 190 Ill. Dec. 950 (5th Dist. 1993)*, to find support for upholding the covenant not to compete. (P1. Mem., at 5). In that case, the court upheld a covenant not to compete entered into between a doctor and a eye center. **Id.** In upholding the covenant, the court specifically noted that medical practice cases differ from typical covenant not to compete cases in that the plaintiff does not have to demonstrate a protectable business interest. *Id. at 1269.* Thus, **Gillespie** is distinguishable from the case at bar in that this case does not involve a medical practice. Furthermore, while plaintiff cites to **Gillespie** to demonstrate that a court could uphold a covenant not to compete if the covenant does not adversely affect the general public, this has no bearing on this **[*13]** court's decision. The court finds the covenant's terms to be unreasonable without regard to whether the covenant adversely affects the general public. Thus,

plaintiff finds no relief in **Gillespie.**

Plaintiff also looks to **Tyler** to support its claim. (P1. Mem., at 6). In **Tyler,** the court found a three year, fifty mile non-compete covenant to be reasonable. *214 Ill. App. 3d at 150-51, 573 N.E.2d at 866-67.* **Tyler** has no bearing on this court's decision since it has determined that TLC's broadly phrased covenant is unenforceable independent of its time and geographical restrictions. [3]

    3  Plaintiff makes this same argument for the non-disclosure and non-solicitation agreements (citing to **Arpac**). For the reasons stated above, plaintiff's argument is irrelevant to this court's decision.

## B. Non-solicitation Covenants

Defendants claim that the non-solicitation covenant is unenforceable because its terms are too broad. (Memorandum, at p.6). Similar to covenants not [*14] to compete, courts will enforce non-solicitation covenants if they are reasonable to protect an employer's interest in its customers. *Arpac, 226 Ill. App. 3d at 76, 589 N.E.2d at 649.* In determining whether an employer has a protectable interest in its customers, courts look to the same test set forth in **Tyler.** More specifically, courts look to see if the employer has a near-permanent relationship with its customers and whether the employee would have had contact with the customers had he not worked for said employer. *Tyler, 214 Ill. App. 3d at 149, 573 N.E.2d at 866.* Courts will not enforce non-solicitation covenants designed to restrict competition. *Arpac, 589 N.E.2d at 649.* Furthermore, Illinois law does not require a geographic limitation in a non-solicitation covenant where the employer does business nationwide and drafted the covenant to protect itself from losing customers as a result of an employee's knowledge of the customers' requirements. *Corroon & Black of Illinois, Inc. v. Magner, 145 Ill. App. 3d 151, 494 N.E.2d 785, 793, 98 Ill. Dec. 663 (1st Dist. 1986).*

Accepting plaintiff's allegations as true, this court initially [*15] finds that plaintiff has a protectable interest in its customers. The question, however, is whether the terms of the non-solicitation covenant are reasonable. Defendants contend that the covenant's terms are unreasonable because they prevent Chase from soliciting TLC's existing customers with whom he has never had any contact as well as TLC's prospective customers. [4] (Def. Mem. at 6-7). Defendants further

contend that this court should not enforce the covenant because it does not contain a geographic limitation. (*Id. at 8*).

    4  In relevant part, the part of the Employment Agreement entitled "Non-Disclosure of Information" states:

> The Employee will not during the term hereof or within one year following the term of the employment disclose the list of the Employer's Customers or Prospective Customers . . . *nor shall Employee solicit for Employee or others, any of the Employer's employees, customers, or prospective customers.*

(Ex. 1, P4)(emphasis added)

Activity restrictions, such [*16] as a non-solicitation covenant, must be reasonably related to the employer's interest in protecting customer relations that developed as a result of the employee's employment. *Corroon, 45 Ill. App. 3d at 165, 494 N.E.2d at 793.* In **Corroon,** the court noted its weariness in enforcing prohibitions against an employee contacting customers beyond those with whom he has had previous contact. **Id.** The court remanded the case for a determination as to whether the employee had contact with all of the customers the covenant restricted him from contacting. **Id.** Similarly, the covenant before this court prohibits Chase from soliciting any TLC customer for a period of one year regardless of whether Chase ever previously contacted the customer. Given the size of TLC's operations and its extensive customer list, the non-solicitation agreement's restriction prohibiting solicitation of existing customers is too broad. Its restriction of "prospective" customers - - a term left undefined and potentially all-encompassing - - is also too broad. While this court has the option of blue-pencilling the problematic provisions, it declines to do so for the reasons previously [*17] stated.

## C. Nondisclosure Covenants

Defendants finally claim that the non-disclosure covenant is unenforceable because it is vague and over broad. (Def. Mem., at 9). Non-disclosure covenants affect a State's interest in promoting commercial competition via the free flow of information. *NAPCO, 172 Ill. App.*

*3d at 415-16, 526 N.E.2d at 624*. Thus, courts will enforce non-disclosure covenants only if they contain reasonable geographical and chronological limitations, they attempt to protect confidential information, and they make reasonably necessary restrictions for the protection of a proprietary interest. **Id.**

Defendants claim, without citing any authority, that the non-disclosure covenant in this case is unenforceable because it does not seek to protect confidential information. However, in its complaint, plaintiff alleges that it maintains a confidential list of its customers. (First Am. Compl., at P16). Accepting this allegation as true, defendants' initial argument fails.

Defendants next claim that the covenant is unenforceable because it contains broad restrictions that render it unreasonable. (Def. Mem., at 9-10). More specifically, defendants claim that **[*18]** the provision stating that the "Employee will not . . . disclose the list of the Employer's Customers or Prospective Customers or *any methods and manners* by which Employer leases, rents, sells, finances, or deals with its products and it customers" to anybody for a period of one year, is unreasonable because it is overly vague and, therefore, void. (Exh. 1)(emphasis added). In **NAPCO**, the court held that the following non-disclosure agreement constituted an impermissible restraint of trade and was void as a matter of law:

> The Employee agrees that neither he, [nor anybody under his control] . . . will at any time, during and after the date of his employment with the Company, disclose . . . any information regarding . . . any and all related items [that employer manufactures], and any and all items of whatever nature or kind which the Employee has learned of, acquired or obtained knowledge of, conceived, developed, originated, discovered, invented or otherwise become aware of during the period of his employment . . .

*526 N.E.2d at 624.* The court reasoned that the agreement had no chronological or geographical limitations. **Id.** The court further **[*19]** found that the agreement was too broad because it purported to protect everything that the employee had learned while employed with NAPCO without any regard for whether the information was confidential. **Id.** Finally, the court stated that the agreement went far beyond protecting any possible legitimate interest of NAPCO. **Id.**

Similarly, the non-disclosure agreement before this court fails to comply with the requirements for an enforceable nondisclosure agreement as set forth in **NAPCO.** The agreement contains no geographical limitation. Furthermore, it seeks to prevent Chase from disclosing "any methods and manners" of TLC's business regardless of whether the method or manner is confidential. Thus, the agreement extends beyond protecting possible legitimate interests of TLC. As with the covenant not to compete, the court declines to exercise its option to blue-pencil the non-disclosure agreement since it would require the court to rewrite the defining term of the restrictive covenant. The court's role is not to rewrite overly broad restrictive covenants.

Accordingly, the court finds that plaintiff's restrictive covenants are unenforceable. The parties are **[*20]** to be prepared to address the impact of this ruling on the plaintiff's temporary restraining order at the next status hearing.

WHEREFORE, for the foregoing reasons, Trailer Leasing Company's restrictive covenants with Gary Chase are unenforceable.

ENTER:

David H. Coar

U.S. District Judge

DATED: JULY 9, 1996